# In the
# United States Court of Appeals
## for the Federal Circuit

APPLIED PREDICTIVE TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

v.

MARKETDIAL, INC., JOHN M. STODDARD,
aka Johnny Stoddard, MORGAN DAVIS,

*Defendants-Cross-Appellants.*

On Appeal from the United States District Court for the
District of Utah in No. 2:19-cv-00496-JNP
Honorable Jill N. Parrish, Judge Presiding

## CORRECTED NON-CONFIDENTIAL BRIEF OF APPELLANT

**FOLEY & LARDNER LLP**
DAVID B. GOROFF
321 North Clark Street, Suite 3000
Chicago, Illinois 60654
(312) 832-4500
dgoroff@foley.com

PAVAN K. AGARWAL
Washington Harbour
3000 K Street N.W., Suite 600
Washington, DC 20007-5101
(202) 672-5300
pagarwal@foley.com

**DENTONS US LLP**
KIRK R. RUTHENBERG
NICHOLAS H. JACKSON
East Tower
1900 K Street, NW
Washington, DC 20006
(202) 496-7500
kirk.ruthenberg@dentons.com
nicholas.jackson@dentons.com

SPENCER HAMILTON
100 Crescent Court
Suite 900
Dallas, TX 75201
(214) 259-0900
spencer.hamilton@dentons.com

*Attorneys for Plaintiff-Appellant, Applied Predictive Technologies, Inc.*



PRINTED ON RECYCLED PAPER


# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1751, 2024-1805 |
| **Short Case Caption** | Applied Predictive Technologies, Inc. v. MarketDial, Inc. |
| **Filing Party/Entity** | Applied Predictive Technologies, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/13/2024

Signature:  /s/ Kirk R. Ruthenberg

Name:  Kirk R. Ruthenberg

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Applied Predictive Technologies, Inc. | | APT Software Holdings, Inc. |
| | | Mastercard International Incorporated |
| | | Mastercard Incorporated |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable       ☑     Additional pages attached

| | | |
|---|---|---|
| David W. Tufts, Dentons US LLP | Eric L. Sophir, Foley & Lardner | Kerisha Bowen, Dentons US LLP |
| Mary Kate Brennan, Dentons US LLP | Megan M. Carroll, Dentons US LLP | Adam Richards, Ray Quinney & Nebeker PC |
| Ashley M. Gregson, Dentons Durham Jones & Pinegar PC | Blake L. Osborn, Dentons US LLP | Elissa C. Jeffers, Dentons US LLP |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives (cont.).** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities

| | | |
|---|---|---|
| Jennifer D. Bennett, Dentons US LLP | Katherine McMorrow, Dentons US LLP | Patrick Doll, Dentons US LLP |
| Samuel C. Straight, Ray Quinney & Nebeker PC | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................ i

CONFIDENTIAL MATERIAL OMITTED (BRIEF) ........................................... viii

TABLE OF AUTHORITIES ...................................................... x

STATEMENT OF RELATED CASES .................................................. xiv

INTRODUCTION ................................................................ 1

JURISDICTION ................................................................ 4

STATEMENT OF ISSUES ...................................................... 5

STATEMENT OF THE CASE ...................................................... 5

    A.    FACTUAL BACKGROUND ........................................... 5

        1.    APT Is A Global Leader In Business Analytics Software ........................................ 5

        2.    APT Partnered With McKinsey To Grow Its Business ........... 6

        3.    APT's Compilations Embody Its Trade Secrets—Its Blueprints For Its T&L Business Model And Implementing Software ............................................ 7

                a.    PCB (Ex.144) ........................................ 10

                b.    Customized Feeds ................................... 14

                c.    SDG (Ex.42) ........................................ 17

        4.    APT Protects Its Secrets ................................... 19

        5.    New Entrants Face Entry Barriers ........................... 20

        6.    Stoddard Abuses His Position At McKinsey To Steal APT Secrets .................................................. 21

        7.    Stoddard Joins MarketDial And Uses APT's Secrets ........... 23

        8.    MarketDial Misuses APT Materials ......................... 24

        9.    Defendants Misused APT's Valuable Secrets For Unfair Competitive Advantage ............................. 25

B. PROCEDURAL HISTORY ...........................................................28

SUMMARY OF ARGUMENT ...........................................................28

ARGUMENT ...................................................................................30

A. Standard of Review ...........................................................30

B. APT's Evidence Demonstrated It Owns Protectable Secrets.............32

    1. APT Demonstrated That Each Compilation Is A Trade Secret ...................................................................33

        a. PCB .........................................................................36

        b. Customized Feeds ...............................................38

        c. SDG ........................................................................39

        d. Meta-Compilations ............................................39

        e. *USA Power I*'s Six Factors Favor APT .........................40

            i) Not Known Outside APT's Business.................40

            ii) Not Shared Broadly Within APT .........................40

            iii) APT Guards Secrecy .............................................40

            iv) Information Was Valuable ..................................41

            v) APT Spent Substantial Time And Money Developing .............................................41

            vi) Defendants Could Not Have Duplicated Compilations Without Theft................................41

    2. APT Demonstrated Its Secrets Are Confidential.....................42

    3. APT Demonstrated Defendants' Misuse Of Its Secrets And Resulting Injury............................................................42

    4. Defendants Injured APT ...........................................44

C. The Court Disregarded APT's Evidence And Made Other Reversible Errors ...........................................................44

    1. The Court Ignored APT's Evidence And Denied APT The Benefit Of Inferences.......................................................45

        a. PCB .........................................................................46

b.  Customized Feeds ................................................. 50

c.  SDG ...................................................... 52

2.  The Court Erroneously Imposed On APT The Burdens Of A Trade Secret Plaintiff At Trial ......................................... 56

3.  The Court Ruled For Defendants Regarding A Critical Trade Secret They Never Challenged ....................................... 59

4.  The Court Erroneously Failed To Consider Whether APT's Compilations As A Whole Were Trade Secrets ............ 59

5.  The Court Erroneously Concluded That Utah's Disclaimer Of Particularity Was Immaterial ........................... 64

6.  The Court Disregarded That Defendants' Misappropriation Evidenced Trade Secrets ............................. 66

7.  The Court Erroneously Dismissed APT's Contract Claim ........................................................................ 67

CONCLUSION ............................................................ 68

**CONFIDENTIAL MATERIAL OMITTED (BRIEF)**

The material omitted in the fourth line of page 3 are names of APT's clients that MarketDial induced into sending APT's Secrets—Appellees also claim these as clients and seek to keep them confidential; the material omitted in the first line of the third full paragraph is the dollar amount of how much it cost APT to develop its Secrets; the material omitted on page 5 is the dollar amount of how much it cost APT to develop its Secrets; the material omitted in the last sentence of the first full paragraph on page 8 describes a specific attribute of the User Interface performance; the material omitted in the first sentence of the last paragraph on page 8 describes technical attributes of APT's analytics software;

the material omitted in the second sentence of last paragraph on page 8 describes the unique attributes a customer can test in APT's software, as well as the technical processes used by APT; the material omitted in the first paragraph on page 9 describes the specific attributes recommended by APT's model; the material omitted on page 11 describes specific aspects of what APT aims to measure through its analytic tools, as set forth in the Partners Capabilities Briefing;

the material omitted on line 6 of page 12 indicates the dollar amount that a pet store increased it sales, as described in a confidential case study; the material omitted on lines 9 and 10 of page 12 describes how testing efficiency was improved for an apparel manufacturer, indicating the number of tests before and after T&L; the material omitted on the last line of page 12 to the first line of page 13 describes how APT designed tests that were significant and predictive of certain performance, describing correlations; the material omitted on lines 3 through 6 of page 13 describes the overall significance that certain attributes had in specific promotions; the material omitted on line 15 of page 13 indicates the average number of tests for APT's retail clients; the material omitted on line 16 of page 13 indicates the magnitude of categories tested by retail clients; the material omitted on lines 1 and 2 of page 14 describes the results of specific APT processes;

the material omitted in the first sentence of the first full paragraph on page 14 describes certain data utilized by APT in the T&L; the material omitted in the last sentence on page 14 describes what classification is key for clients when using predictive analytics; the material omitted at the bottom of page 15 indicates the name of an APT client that MarketDial induced into sending APT's Secrets;

the material omitted on lines 1 and 2 of page 16 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on line 3 in the first paragraph on page 16 describes specific data that was tested by APT's Customized Feeds; the material omitted in the second and third paragraph on page 16 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted in the last paragraph of page 16 indicates names of APT's clients that MarketDial induced into sending APT's

Secrets; the material omitted in footnote 5 of page 16 indicates the name of an APT client that MarketDial induced into sending APT's Secrets;

the material omitted on lines 1 and 2 of page 17 are specific categories of APT data that were disclosed by MarketDial; the material omitted in the second complete paragraph on page 18 describes a desired goal for the architecture that is provided in the SDG; the material omitted in the last full paragraph on page 18 details the various architecture attributes that APT provides to its customers; the material omitted in the first paragraph on page 19 details the specific network protocol utilized by APT and details APT's data transfer process; the material omitted in the second paragraph on page 19 indicates details about APT's software and system practices as disclosed in APT's SDG; the material omitted in the block quote of page 21 describes specific intelligence that Stoddard gained regarding characteristics of APT's software platform; the remaining material omitted on page 21 describes the specific results that the APT User Interface provides to users; the material omitted on page 24 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted in line 1 of page 25 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted in the first full paragraph on page 25 indicates APT clients that Stoddard presented information to, utilizing APT's Secrets; the material omitted in the first full paragraph under the header "Defendants misused APT's valuable secrets for unfair competitive advantage" on page 25 describes specific resources that are important for developing competing software; the material omitted in the last paragraph on page 25 is the dollar amount of how much it cost APT to develop its Secrets; the material omitted on page 27 indicates the specific aspects of APT's analytics software as used by MarketDial for business development; the material omitted on page 36 is the dollar amount of how much it cost APT to develop its Secrets; the material omitted on page 37 indicates the specific aspects of APT's analytics software as used by MarketDial for business development; the material omitted on page 38 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on page 40 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on page 41 is the dollar amount of how much it cost APT to develop its Secrets; the material omitted on page 42 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on page 44 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on page 47 indicates the specific aspects of APT's analytics software as used by MarketDial for business development; the material omitted on page 49 describes an APT technique that is fundamental to APT's Secrets; the material omitted in the body of page 50 describes specific processes used for APT's Customized Feeds; the

material omitted in footnote 19 of page 50 indicates APT clients that MarketDial presented information to, utilizing APT's Secrets; the material omitted in the first paragraph of page 51 indicates an APT client that MarketDial presented information to, utilizing APT's Secrets; the material omitted in the last paragraph of page 51 describes the specific data APT gathered in order to recommend business strategies to a customer; the material omitted on lines 2, 5, 6, and 8 of page 52 indicates the name of an APT client that MarketDial induced into sending APT's Secrets; the material omitted on lines 9 through 11 of page 52 describes the specific categories that APT analyzed in order to recommend a specific business strategy to a customer; the material omitted in lines 1 and 2 of page 53 details the technical architecture utilized by APT; the material omitted in line 4 of page 53 details APT's unique approach to monitoring; the material omitted in the second paragraph on page 53 details the technical architecture utilized by APT; the material omitted in the first paragraph of page 54 details the various standards, protocols, and security measures utilized by APT; the material omitted in the second paragraph of page 54 describes a desired goal for the architecture that is provided in the SDG; the material omitted in lines 1 and 2 of page 55 indicates a specific process used by APT for designing its platform; the material omitted in the second paragraph on page 55 describes aspects of APT's chosen technical architecture; the material omitted on page 60 indicates a specific aspect of APT's analytics software as used by MarketDial for business development.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*3M v. Pribyl*,
259 F.3d 587 (7th Cir. 2001) .............................................................61

*Ajuba Int'l, LLC v. Saharia*,
2014 WL 3520525 (E.D. Mich. July 14, 2014) ...................................31

*Alpha Pro Tech, Inc. v. VWR Int'l LLC*,
984 F. Supp. 2d 440 (E.D. Pa. 2013) ..................................................38

*Bimbo Bakeries USA, Inc. v. Sycamore*,
39 F.4th 1250 (10th Cir. 2022) ....................................... 32, 56, 57, 58

*Bimbo Bakeries v. Sycamore*,
2017 WL 1405637 (D. Utah, Apr. 12, 2017)................................. 58, 63

*Brigham Young Univ. v. Pfizer*,
861 F. Supp. 2d 1320 (D. Utah 2012)..................................................34

*Butler v. Daimler Trucks N. Am., LLC*,
74 F.4th 1131 (10th Cir. 2023) ...........................................................59

*Camick v. Holladay*,
758 F. App'x 640 (10th Cir. 2018) ......................................................31

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*,
53 F.4th 368 (6th Cir. 2022) ...............................................................57

*Coda Dev. S.R.O v. Goodyear Tire & Rubber Co.*,
2023 WL 2734684 (N.D. Ohio Mar. 31, 2023) ...................................39

*Digital Control, Inc. v. Charles Mach. Works*,
437 F.3d 1309 (Fed. Cir. 2006) ..........................................................68

*dmarcian, Inc. v. dmarcian Europe, BV*,
60 F.4th 119 (4th Cir. 2023) ...............................................................32

*Dodson Int'l Parts, Inc. v. Altendorf*,
347 F. Supp. 2d 997 (D. Kan. 2004)...................................... 29, 56, 63

*Finjan LLC v. SonicWall, Inc.*,
 84 F.4th 963 (Fed. Cir. 2023) ...................................................30

*Forth v. Laramie Cty. Sch. Dist. No. 1*,
 85 F.4th 1044 (10th Cir. 2023) ..............................................45

*Givaudan Fragrances Corp. v. Krivda*,
 639 F. App'x 840 (3d Cir. 2016) ............................................63

*Gross v. Burggraf Constr. Co.*,
 53 F.3d 1531 (10th Cir. 1995) ................................................64

*Harvey Barnett, Inc. v. Shidler*,
 338 F.3d 1125 (10th Cir. 2003) ............................... 30, 32, 36

*IDX Sys. Corp. v. Epic Sys. Corp.*,
 285 F.3d 581 (7th Cir. 2002) .............................................. 61, 62

*Imax Corp. v. Cinema Techs., Inc.*,
 152 F.3d 1161 (9th Cir. 1998) ...............................................62

*In re Cambridge Biotech Corp.*,
 186 F.3d 1356 (Fed. Cir. 1999) .............................................31

*Malhotra v. Cotter & Co.*,
 885 F.2d 1305 (7th Cir. 1989) ...............................................59

*Motorola Solutions, Inc. v. Hytera Comm'ns Corp.*,
 495 F. Supp. 3d 687 (N.D. Ill. 2020) .................................61

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
 855 F. App'x 701 (Fed. Cir. 2021) ......................................63

*Oldham v. O.K. Farms, Inc.*,
 871 F.3d 1147 (10th Cir. 2017) .............................................59

*OsteoStrong Franchising v. Richter*,
 2020 WL 4584007 (D.N.M. Aug. 10, 2020) .....................56

*Raytheon Co. v. Indigo Sys. Corp.*,
 895 F.3d 1333 (Fed. Cir. 2018) ..............................................5

*REXA, Inc. v. Chester*,
 42 F.4th 652 (7th Cir. 2022) ..................................................62

*Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*,
  28 F.3d 1042 (10th Cir. 1994) ................................................................ *passim*

*Rocky Mt. Wild Inc. v. U.S. Forest Serv.*,
  56 F.4th 913 (10th Cir. 2022) ................................................................ 64

*Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*,
  773 P.2d 1382 (Utah 1989) ................................................................ 67

*Roton Barrier, Inc. v. Stanley Works*,
  79 F.3d 1112 (Fed. Cir. 1996) ................................................................ 31

*Salt Lake City v. Kidd*,
  435 P.3d 248 (Utah 2019) ................................................................ 64

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
  491 F.3d 350 (8th Cir. 2007) ................................................................ 65

*Surgenex, LLC v. Predictive Therapeutics*,
  462 F. Supp. 3d 1160 (D. Utah 2020) ................................................................ 64

*Sw. Stainless, Ltd P'ship v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) ................................................................ 57

*Synopsys, Inc. v. Risk Based Sec., Inc.*,
  70 F.4th 759 (4th Cir. 2023) ................................................................ 62

*Synthex Opthalmics, Inc. v. Tsuetaki*,
  701 F.2d 677 (7th Cir. 1983) ................................................................ 61

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,
  966 F.3d 46 (1st Cir. 2020) ................................................................ 62

*USA Power, LLC v. PacifiCorp.*,
  235 P.3d 749 (Utah 2010) ................................................................ *passim*

*USA Power, LLC v. Pacificorp.*,
  372 P.3d 629 (Utah 2015) ................................................................ *passim*

*Utah Medical Products v. Clinical Innovations*,
  79 F. Supp. 2d 1290 (D. Utah. 1999) ................................................................ 63

*Water & Energy Sys. Tech., Inc. v. Kell*,
  974 P.2d 821 (Utah 1999) ................................................................ 58

**Statutes and Other Authorities:**

18 U.S.C. § 1836(c) ...................................................................4

18 U.S.C. § 1839(3) .................................................................32

28 U.S.C. § 1295(a)(1) ..............................................................4

28 U.S.C. § 1331 .......................................................................4

28 U.S.C. § 1338 .......................................................................4

*Restatement of Torts* § 757 ....................................................33

Utah Code § 13-24-2(4) ...........................................................32

## STATEMENT REGARDING ORAL ARGUMENT

Applied Predictive Technologies, Inc. ("APT") respectfully requests that the Court grant oral argument. Oral argument would assist the Court in understanding the extensive evidence and legal issues demonstrating that the district court erred in granting summary judgment on APT's trade secret claims.

## STATEMENT OF RELATED CASES

There are no related cases to this Appeal.

# INTRODUCTION

The District Court for the District of Utah ("Court") egregiously erred in granting Defendants summary judgment on Plaintiff Applied Predictive Technologies' ("APT's") trade secret claims. Its Decision must be reversed.

Defendants stole at least three compilation trade secrets embodying the blueprint for its software and business model— how to develop and run its Test & Learn ("T&L") business based on its automated predictive business analytics software platform, including its unique vision, software, methodologies, technologies, and experience.[1] *First*, APT's 67-slide "Partners Capabilities Briefing" ("PCB") explains how APT's T&L works and outperforms traditional testing techniques, especially for retail "brick and mortar" businesses, providing details of its software and user experience, including how users most effectively interact with T&L along with methodologies and case studies. *Second*, APT's Customized Data Feeds ("Customized Feeds") transform raw client data by organizing and linking this into new, unique data structures, enabling APT and its clients to use T&L to perform richer data analysis. *Third*, APT's Standard Deployment Guide ("SDG") articulates APT's specific technology choices which enable its T&L software to optimally perform for clients, including its logical architecture, server and software, maintenance routines, security features and

---

[1] These are APT's "Secret(s)" or "Compilation(s)."

protocols, data centers, hosting facilities and data transfer protocols. The PCB, Customized Feeds and SDG are each themselves compilation secrets, and, together, form a Compilation that provided Defendants a roadmap to compete with APT and steal clients and business.

Defendants stole these Secrets in two ways. First, they exploited a partnership between APT and the consulting firm McKinsey & Company, Inc. ("McKinsey"), where John Stoddard worked assisting APT. APT worked with McKinsey to deploy T&L to McKinsey's clients. To educate McKinsey about T&L, APT shared confidential and trade secret information after McKinsey signed a Cooperation And Confidentiality Agreement requiring McKinsey and its employees to protect APT's confidentiality.

Even before beginning this assignment, Stoddard began stealing APT's Secrets and sending "intel" about APT to Morgan Davis, who, with Stoddard, started MarketDial. (Appx3912-16). On February 20, 2015, before meeting APT— Stoddard forwarded Davis excerpts of APT's PCB. (Appx3912-16). For five months—from February 16 to July 16, 2015— Stoddard worked with APT's secrets and induced APT to send more, promising to get them into "the right hands." (Appx6969-85; Appx7004-20). Then, immediately before leaving McKinsey, Stoddard clandestinely downloaded 6,494 confidential files, including the PCB.

(Appx5702). Stoddard immediately joined MarketDial and began using the PCB and SDG to develop MarketDial's software and business.

Defendants' second form of theft was to induce APT's clients—including `Client` and `Client` — to send them Customized Feeds, which, by contract, were APT's confidential property. Defendants then repackaged APT's work as their own.

Defendants knew they were stealing trade secrets. Stoddard acknowledged to Davis his McKinsey contract meant APT's information "must be held in confidence during and after my McKinsey employment." (Appx7172). He believed there was "no way for McK to police" their theft, (Appx7175), but knew that if APT found out "that would be a disaster." (Appx7172).

Defendants built their business on Secrets that took APT 16 years and `Dollar amount` to develop, sparing MarketDial R&D costs, rapidly accelerating its entry as a competitor and allowing it to undercut APT and steal customers.

Any trade secret in APT's Compilations, considered collectively or individually, compelled denial of summary judgment. Yet the Court found APT had none because it disregarded material evidence cited in APT's Response to Statement of Undisputed Material Facts ("RSOF") and erroneously:

- held APT to the standard applicable to trade secret plaintiffs *at trial*, requiring APT to establish such secrets and that they were nonpublic, when Tenth

Circuit courts hold that a non-movant needs only present "some evidence" of its secrets to defeat summary judgment;

- failed to properly weigh reasonable inferences in favor of the non-moving party, as controlling precedent requires at summary judgment;

- improperly considered arguments not raised by Defendants, rejecting APT's 67-page, full version of the PCB as a trade secret, when Defendants challenged only an abridged, 28-page version;

- failed to consider each Compilation as a whole, improperly focusing on whether components were trade secrets;

- treated Utah and federal law as identical, despite Utah law's disclaimer of particularity;

- disregarded that Defendants' malicious acts supported the existence of trade secrets; and

- dismissed APT's contract claim.

## JURISDICTION

The Court had federal jurisdiction under 28 U.S.C. §§1331, 1338, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836(c). Appellate jurisdiction exists under 28 U.S.C. §1295(a)(1). This appeal follows a final judgment entered against APT on March 27, 2024. APT noticed its appeal on April 24, 2024. Jurisdiction is proper in this Circuit because APT originally brought a patent

infringement claim which the Court resolved on the merits against APT. *Raytheon Co. v. Indigo Sys. Corp.*, 895 F.3d 1333, 1339 (Fed. Cir. 2018).

## STATEMENT OF ISSUES

Whether the Court committed reversible error by:

a)    ignoring APT's evidence and denying APT the benefit of reasonable inferences;

b)    holding APT to the standard applicable to trade secret plaintiffs at trial;

c)    focusing on whether components of APT's Compilations were trade secrets, while disregarding the whole;

d)    giving no weight to Utah law's disclaimer of particularity;

e)    ignoring that Defendants' malicious acts supported the existence of trade secrets; and

f)    determining that APT was not a third-party beneficiary of the McKinsey/Stoddard Confidentiality Agreement.

## STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

#### 1.    APT Is A Global Leader In Business Analytics Software

APT essentially created the automated predictive analytics and testing industry for brick-and-mortar businesses. (Appx3221; Appx5050-51; Appx5056-57). APT spent 16 years and [Dollar amount] with 350 employees developing T&L.

(Appx1219; Appx2505; Appx2565; Appx2847-48; Appx5497). T&L can isolate the individual impact of multiple variables on a client's business activity. (Appx6438-39; Appx6463-64).

APT serves clients in numerous industries, including retail, financial services, and consumer packaged goods ("CPG"). (Appx6435; Appx5056-57). APT licenses T&L to customers, including Wal-Mart and Coca-Cola, for confidential use and provides professional services and support. (Appx6435).

### 2. APT Partnered With McKinsey To Grow Its Business

In 2013, APT and McKinsey partnered to develop client relationships. (Appx2117; Appx1632-33). Through this relationship, APT sought to be "front of mind" for the McKinsey partners advising clients on business strategy and analytic techniques. (Appx1632). To accurately convey T&L's benefits, McKinsey needed a "fair bit of depth" about how APT's solution worked. (Appx1649). After McKinsey executed a Cooperation and Confidentiality Agreement dated November 7, 2013, which Stoddard knew about, APT shared confidential details about its T&L business model. (Appx4343-44; Appx2116).[2] This required McKinsey—and its employees— to keep APT's information confidential. Stoddard acknowledged this obligation. (Appx7171-73). APT marked each page of its trade secrets "APT Confidential

---

[2] In their Motion for Summary Judgment, Defendants downplayed this Agreement and its broader terms, focusing instead on a superseded 2012 APT-McKinsey Non-Disclosure Agreement. (Appx6324, ¶ SOF 11; Appx6350, SOFs ¶¶ 130-33).

Information-Distribution by receiving party is prohibited." (*E.g.*, Appx6432-98). The SDG warned that misuse would result in "severe civil and criminal penalties." (Appx3726).

Stoddard was independently obligated to preserve McKinsey client trade secrets pursuant to his Proprietary and Confidential Information Agreement signed August 9, 2013 ("<u>Confidentiality Agreement</u>") (Appx7171-73; Appx7179-81; Appx7402-04), and McKinsey's Code of Conduct. (Appx5319-20).

Davis was also restricted from using APT's trade secrets. From 2012-14, Davis worked at Boston Consulting Group ("<u>BCG</u>"), which used APT's T&L. Davis was obligated to protect APT trade secrets pursuant to BCG's Mutual Confidentiality and Nondisclosure Agreement with APT dated April 9, 2014. (Appx7151-54). Davis also was restricted by his employment agreement (Appx7408-11) and BCG's Code of Conduct (Appx7151-54).

### 3. APT's Compilations Embody Its Trade Secrets—Its Blueprints For Its T&L Business Model And Implementing Software

Kevin Keane, then-APT's SVP-Alliances, testified that the confidential Compilations given McKinsey were APT trade secrets, showing "how APT worked, what its solutions did, how … value was created for clients." (Appx1648). These contained "a blend of technical capabilities of the software and use cases and positioning…." (Appx1648). Keane testified "the techniques used to, for instance,

create a control group and to match that … and the various details of the checking that assists the analyst of the APT software … and the types of diagnostic reports and outputs … the details of those, how they are produced and utilized" far exceeded anything in marketing materials. (Appx1649).

APT's T&L solution, as embodied in its Secrets, is a "first-of-its-kind" automated business predictive analytics software model that measures and provides incremental impact information concerning hundreds of parameters tied to a specific business, especially "brick and mortar" entities. T&L's user interface ("UI") enhances the user experience and provides a best practices workflow to design tests to predict performance. (Appx6449). The UI presents performance information tied to individual characteristics, makes ███Results███ and recommends actions. (Appx5057-62; Appx5543-51).

APT's analytics software addresses key attributes, including automatically determining the number and locations of test sites with statistical significance correlated to test sites for predicting rollout performance, choosing representative test ██Place██ and providing an optimal control group based on selected factors to ██Outcome██. The analysis uses ██Processes██ to determine which parameters accurately measure ███result███ (Appx6477-82). The model synthesizes information from numerous data sources and assesses many attributes.

For retail customers, APT brings knowhow concerning the characteristics being tested, including how frequently each characteristic is tested. APT's model recommends unique attributes for a retailer to test, including ██Attribute██ and ██Attribute██ ██Attribute██ ██Attribute██ ██Attribute██ and ██Attributes██. APT has similar models for other industries, including telecommunications and CPG. (Appx5552-54).

Expert Steven Kursh explained that Defendants used APT's Secrets as a "masterclass" in building a business focused on predictive analytics software. Defendants stole APT's "DNA" and gained a "blueprint of a successful product to build against," while avoiding the years of effort otherwise necessary to learn this. (Appx5333; Appx5539-40).

Kursh stated that "the complete compilation of those 'trade secrets', even if some pieces were publicly available, comprises an overall confidential and proprietary compilation or compilations that enabled the development, construction and use of the APT software." (Appx5384). Expert Stefan Thomke explained that APT's Secrets "provide unique value by the way in which the confidential and public information is combined," which "could not be readily ascertained by a third party through proper means." (Appx5050).

APT's Secrets include:

## a.    <u>**PCB (Ex.144)**</u>[3]

The PCB provides details about APT's business model and how to run T&L, including the user experience and how a user interacts with the software. APT's witnesses testified that its purpose was to help McKinsey understand the "essence of the distinction" between the traditional approach and APT's. (Appx1676; Appx2531).

As APT emphasized in its RSOF (Appx7433-35, RSOF ¶¶42-43), Defendants never challenged whether the PCB in whole (67 slides) was a compilation trade secret, thereby conceding this point on summary judgment. Defendants only challenged a 28-slide version. (Appx6330, SOF ¶42), ignoring a 40-slide appendix containing non-public, competitively-advantageous information. (Appx6431-98).

Kursh concluded that the whole PCB was a compilation trade secret. (Appx5384-85; Appx5386-87). It teaches the "sequence of steps for marketing," and "[t]he slide deck provides the steps necessary for a vendor to compete in the various sectors, including the financial services sector and describes APT's methodology and approach to its software." (Appx5233). It describes four "critical business

---

[3]APT shared multiple versions of the PCB with McKinsey. Ex.144 (Appx6431-98). A 67-slide version from December 2014, is most complete, was downloaded by Stoddard to his personal computer and used at MarketDial, (Appx5685-86, Appx5695-96) and was addressed by the Court. McKinsey produced it in black-and-white, so APT's Experts used screen shots from a 62-slide color version, so some slides have different numbers, but they are the same as in Ex. 144. (Appx5504-05). Slide numbers herein are from Ex.144 (Appx6431-98).

factors": 1) industry-specific information; 2) measuring incremental impact in predictive business analytics software; 3) institutionalization of business analytics software at subscribers; and 4) consulting pitch deck and stats methodology. (Appx5543-44).

Thomke described the PCB as a "blueprint for starting a company that supplies analytic tools to measure cause-and-effect relationships between ▇Actions▇ ▇Actions▇ and ▇Results▇." (Appx5504). Thomke emphasized that it provided trade secret information about sample selection, control group matching and UI. (Appx5068-74).

The cumulative effect of the information in individual PCB slides makes the whole Compilation a trade secret, including:

> Slide 7—Lists areas for test application. (Appx5508; Appx5543-44 (provides "set of techniques that apply in retail"); Appx2533).

> Slide 12—Explains T&L's benefits relative to traditional predictive analytics, including: a) accelerating the experimental process; b) automating data collection and management; c) providing an easy-to-use interface; d) providing transparency in analytical methods; e) providing an understandable assessment of initiatives; f) enabling a

granular segmentation of results; and g) being scalable across initiatives. (Appx6443).

Slides 17-23—Guide users through the UI. (Appx5508).

Slides 13,25-29—Presents confidential case studies describing applications, tests and outcomes, including that a new fixture increased pet store sales by ▮Dollar amount▮ (Appx5508). For example, slide 13 describes T&L's impact on an apparel manufacturer, noting it improved a) testing efficiency—moving from ▮Number▮ tests before T&L to ▮Number▮ after; b) design—moving from unstructured trials to statistically significant trials with representative sampling; c) scope—moving from only sampling pricing and some operations to sampling more operations, capital deployment, marketing and labor; and d) rollouts—moving from unfocused to targeted rollouts. (Appx6444).

Slide 18—Describes how APT designed tests that are significant and predictive of rollout performance, providing user configurability for the testing, while presenting the correlation between number of tests and significance; for example, that running ▮Number▮ tests was ▮Percentage▮

significant, while running ▮ was ▮Percentage▮ significant. (Appx5508; Appx6449).

Slide 21—Quantifies the ▮result▮ of individual attributes, concluding with ▮Percentage▮ driver significance that a promotion's ▮Promotion▮ version had ▮Percentage▮ lift, while a ▮Percentage▮ version had ▮Percentage▮. (Appx5508; Appx6452).

Slide 23—Describes how T&L automatically generates key outputs and updates these while testing, including analysis settings, result summary, trend chart; result detail; margin result detail and margin category impact. (Appx6454).

Slide 31—Shows 2013 benchmarks for APT's retail clients, including categories and number of tests, noting customers average ▮ tests. (Appx5508-09; Appx6462).

Slides 32-33—Identify ▮ categories tested by retail clients and quantify the percentage of clients that tested each category. (Appx5508-09; Appx6463-64).

Slides 46-51—Describe results of APT's [Processes] comparing expected and observed [result] (Appx5508-09; Appx6477-82).

Slides 56-62—Describe T&L applications for banks, financial services entities, telecoms and CPG companies. (Appx5552-57).[4]

**b.** **Customized Feeds**

To develop Customized Feeds, APT begins with clients' raw data. APT uses its experience developed through millions of tests and consultations to refine that into effective data structures to determine what [Information], [Information] and [Information] of data and [Information] structuring of data best maximize T&L's accuracy and value for each client. APT builds these Feeds with the "confidential ideas, concepts, discoveries, processes, procedures and knowhow" contained in T&L. APT "transform[s]" raw data and helped clients identify what [Classification] and structures were key for using predictive analytics to help their business—the Customized Feed.

---

[4]APT focuses on its most important Compilations. Others are also protectable. The Court acknowledged that APT's T&L Presentation presents a subset of the PCB and that other trade secrets at issue contain information found in the PCB or SDG. (Appx30-32, Appx31, n.23) (citing T&L Effectiveness Guide (Appx3761-87) and T&L Presentation (Appx3896-903; Appx3904-11)).

(Appx5276). This provides "a richer source of data and enable[s] valuable analytics not previously possible." (Appx5278).

Kursh explained that APT's Customized Feeds "were developed based on APT's intrinsic … and extrinsic knowledge … developed over many years, and … replete with learning 'what to do and not to do.'" (Appx5581).

Thomke stated, "the APT Data Feed was *as important as the methodology itself*…. The adage 'garbage in, garbage out' applies …: Unless [T&L] is fed with high quality data, the statistical estimates and predictions couldn't be trusted." (Appx5077). Thomke explained that "the client may have all of the data sets identified by APT, but had not properly organized, linked and consolidated the data." (Appx5079). While certain data inputs were publicly known, APT's specific data structure was confidential and proprietary. (Appx5285-86).

Kursh described the Customized Feeds' value. Using client raw data alone would have resulted in useless testing results. (Appx5283-84). With APT's Customized Feeds, a competitor could develop rival products faster or with fewer resources, that could either mirror APT's testing results or distinguish theirs from APT's, as Defendants did. (Appx1283; Appx7374 (Stoddard sought APT's Customized Feed from ███Client███, "likely a mirror of how they do it for APT.")).

Defendants stole APT's Customized Feeds for ███Client███.[5] APT met weekly with ███Client███ from 2014-17, advising on data APT needed for customization. APT's Customized Feeds tested more ██Information██, ██Classification██ attributes and ███Specific data███ (Appx5287-97).

███Client███ agreements with APT prohibited disclosure of Customized Feeds. (Appx4582-93; Appx5081-82). Nonetheless, MarketDial induced ███Client███ to share these, which MarketDial then used to develop its rival software product. (Appx5297-98; Appx5301-02; Appx5082-83). MarketDial offered services to ███Client███ for free. (Appx2168; Appx2436).

Before receiving APT's Customized Feeds, MarketDial had no fully-developed software tool to offer ███Client███ (Appx5082-83; Appx2437). MarketDial only developed one in 2018. (Appx2973-74; Appx5301-02). Obtaining APT's Customized Feed saved MarketDial time and money and reduced MarketDial's risk of failure. (Appx5298-303). This allowed MarketDial to undercut APT and steal ███Client███ as a client. (Appx2850; Appx6242-43).

MarketDial similarly induced ███Client███ and ███Client███ to provide APT's Customized Feeds. (Appx5305; Appx5412). MarketDial told ███Client███ "we can simply take the existing APT feed, which I am assuming will be recreated in the new BI [Business Intelligence] solution…." (Appx7311). MarketDial told ███Client███ that

---

[5] ███Client███ operates gas stations and convenience stores throughout the Southwest.

"we received a historical dump of APT data ( APT data , APT data Classification attributes,

APT data , etc.) and we have been working since on cleaning/aggregating the data

and getting it into our software." (Appx7354).

### c.    SDG (Ex.42)

The SDG shows how APT set up T&L's software to work. APT shared this

with McKinsey. (Appx2519). Stoddard received APT's SDG on April 29, 2015,

uploaded it to his hard drive as he left McKinsey, and studied it at MarketDial while

developing its methodology and approach. (Appx7014-15; Appx5687-88;

Appx5693).

The SDG "provides client partners with a technical overview of the APT

'Software-as-a-Service-Solution.'" (Appx5509-10). It discloses APT's unique,

confidential, proprietary choices regarding file transfer, account authentication

approach, data encryption and transfer of encrypted data. (Appx2528-29). It

provides a "play book" showing what architectural and security structure satisfies

customers, including:

    a)      technical architecture

    b)      data center

    c)      data transfer

    d)      backup and recovery

    e)      monitoring and

    f)      installation

(Appx3724-31; Appx2833).

Kursh testified that the whole SDG was a trade secret. He stressed that while some components of the SDG followed industry standard, APT's *combined choices* shown therein did not, providing MarketDial a "blueprint" for the investment necessary for deployment and security. (Appx3396-97).

Kursh said the SDG "would provide a potential competitor with valuable information about the ▮Amount▮ architecture, data practices, and security that it would need to satisfy customers and enable the competitor to design competitive measures that could be compared and contrasted with APT." (Appx5236). It described APT's timelines for implementation, enabling MarketDial to develop competing timelines. (Appx5584-85). MarketDial could evaluate tradeoffs and priorities and avoid mistakes in deploying its own system, even if MarketDial made different choices. (Appx3397). This reduced MarketDial's risk of failure and saved time and resources. (Appx5240-41).

APT's corporate representative, Anthony Holmes, testified that the SDG discloses unique technical architecture attributes, including that APT provides customers ▮Architecture attribute▮ elements—the ▮Architecture▮, ▮Architecture▮, and ▮Architecture▮ ▮Architecture▮ —and uses a ▮Architecture▮ that runs in a more ▮Environment▮ ▮Environment▮. (Appx2648-49).

18

Holmes testified that the SDG discloses APT's choices regarding data transfer—that APT uses ███ Network ███ protocol ("██Network protocol██"), and "██ Program ██ Program," a data encryption product, stating "it's not that there aren't SAS solutions that allow ██Network protocol██, but not every SAS solution requires data transfer, and of those that do … might use a ███ Process ███." (Appx2651). He added that APT customizes ██ Process ██ for clients in a "██ Category ██ database server." (Appx2651).

For monitoring, the SDG showed APT's approach, including the uptime occurring at ██ Time ██ intervals and ██ Time ██ of disk space and memory usage. (Appx2529).

Kursh concluded that MarketDial used the SDG to compete, testifying that "a large part of MarketDial is derived from trade secret information in APT 2 [the SDG]." (Appx3398).

### 4. **APT Protects Its Secrets**

APT's robust security policies protects its Secrets. APT uses physical controls—storing information inside secure data centers with security mechanisms including cameras, 24/7 security, alarm systems, using biometric data and identification badges. APT keeps electronic information on secure servers, protected by access controls and use of complex passwords. APT stores hard copies in locked cabinets or safes and shreds them when no longer necessary. (Appx1293-94).

APT vets employees before hiring and requires confidentiality agreements and security training. (Appx1293-94). Employees may only access certain APT trade secrets on a "need to know" basis. (Appx6507). APT's employee handbook advises on handling sensitive information. (Appx2811-12).

APT requires that departing employees return confidential information and electronic devices, including phones and laptops. On an employee's last day, APT terminates access to APT files and programs. (Appx6507).

Externally, APT enters into confidentiality agreements before sharing confidential information, including software. APT limits how many third-party accounts each client receives to access T&L software. These require complex passwords, with automatic lockouts if suspicious activity is detected. (Appx1293).

## 5. New Entrants Face Entry Barriers

Thomke concluded that achieving reliable analytical results takes years of testing experience, R&D and millions of dollars. (Appx5060). New entrants in 2015-16 faced "very high barriers to entry" including "access to experienced technical professionals, sustained investments in R&D (before any sales can be achieved), and client loyalty (trust in the integrity of results)." (Appx5050-51). "APT's solutions aren't off the shelf…and were often application-specific." (Appx5050, Appx5058).

### 6.     Stoddard Abuses His Position At McKinsey To Steal APT Secrets

Stoddard's assignment to evaluate APT's software offerings for McKinsey ran from February 2015 until July 16, 2015. (Appx2). However, before that, in January 2015, Stoddard and Davis discussed plans to start a business together. (Appx6515-16). Before Stoddard first spoke to APT, Davis urged him to find and send APT trade secret information to launch a business to compete with APT. Stoddard began sending materials on February 16, 2015, four days before his introduction to APT, and sent more on February 20, 2015. (Appx3912-16; Appx4513-18). Stoddard disclosed to Davis "some more intel on APT," including:

> [APT's] offering is a sw platform that provides ▢Information▢ ▢Information▢ ▢Amount▢ of stores for certain ▢Factor▢ level), optimal control group selection, calc of true incremental impact, granular analysis of where tests do better and why and ▢Category▢ recommendations on where to roll out the program. (Appx3914).

Stoddard noted that APT "measure[s] the cross-store impact given that many stores are geographically close," adding that "the GUI [user interface] is pretty intuitive with ability for individuals to collaborate on test process giving a ▢Information▢ ▢Information▢ as well as ▢Information▢ of results." (Appx3914).

Stoddard described the value of seeing APT's methods, stating "[c]ausality and controlling variables is tricky stuff…." (Appx6517). Stoddard emailed Davis an excerpt from APT's PCB, telling him "you didn't get this from me." (Appx3915;

Appx2126). Davis replied, "this is exactly as I had hoped." (Appx3915). Davis

wanted to "take apt down." (Appx3914).

Stoddard asked APT for trade secret information under the guise of facilitating

joint marketing efforts between McKinsey and APT. (Appx6970 (asking Keane to

include him on transmittals of APT work product "as I'll be the one helping getting

that into the right hands."); Appx7019-20 (requesting PowerPoints of case studies)).

Stoddard never requested or received authorization to disclose APT's

confidential information. (Appx2111). Stoddard knew his theft violated obligations

owed McKinsey and APT, telling Davis:

> My confidentiality obligation with APT is covered by
> McKinsey's general confidentiality agreement that I
> signed when joining the firm, which is super
> comprehensive by design. **It basically states that any
> information that I gain about clients (APT would be
> considered a client in this case) must be held in
> confidence during and after my McKinsey
> employment.** (Appx7172) (emphasis added).

Stoddard said he was "trying to be super careful here, since if I get this wrong and

APT came after us some months down the road **that would be a disaster**."

(Appx7172) (emphasis added).

The SDG advised Stoddard that he faced severe civil and criminal penalties

for unauthorized use or distribution. (Appx3726). But Stoddard believed he would

not get caught. While telling Davis in December 2015 that "I'm not really supposed

to be working on any other ventures outside of McK while here," he reasoned "[o]f course, there's no way for McK to police this." (Appx7175) (emphasis added).

On April 3, 2016, immediately before leaving McKinsey, Stoddard copied **6,494** files from McKinsey onto his personal hard drive and laptop. (Appx5687, n.22; Appx5692-94; Appx5702; Appx5503-04) (referencing FTI's forensic analysis)). This included versions of the PCB and the SDG (Appx5687-88; Appx5692-95; Appx5698; Appx5702-03; Appx5540-43; Appx5583-86; Appx5509-10). Stoddard's assignment for APT had concluded nine months earlier— he had no legitimate reason to download or use these Secrets. (Appx5505-07; Appx5685-86).

### 7. <u>Stoddard Joins MarketDial And Uses APT's Secrets</u>

Even before leaving McKinsey, Stoddard was helping form MarketDial, and wrote a paper discussing this for his Business School class in early 2016. (Appx2102).

After McKinsey, Stoddard joined MarketDial as Chief Data Scientist, Board member and co-founder. (Appx6525-26; Appx2135; Appx2141). Stoddard became MarketDial's statistics and methodologies "guy." (Appx2421).

After joining MarketDial, Stoddard accessed APT trade secrets he had copied onto his hard drive as he was leaving McKinsey, including the PCB and SDG. (Appx5685-88). He had the PCB open for approximately 13 hours from April 12-20, 2016. (Appx5685-86). After that, Stoddard created seven MarketDial

presentations titled "MarketDial analytical modules." (Appx5689-91). By comparing the time Stoddard spent with the PCB open on his MarketDial computer and when he drafted these modules, Thomke and Kursh concluded he used the PCB to draft them. (Appx5504-08; Appx5577-78). On April 22, 2016, the PCB and SDG were among 5,560 files deleted from Stoddard's hard drive. (Appx5696-98, Appx5702). Stoddard transferred stolen APT documents from his laptop to MarketDial's computers. (Appx5694-96, Appx5702-03). There, he accessed the PCB and SDG. (Appx5685-88, Appx5694-95; Appx1025).

### 8.    MarketDial Misuses APT Materials

Defendants used APT trade secret information many times after July 16, 2015. (*See* Appx2128-29; Appx5702-03).

In pitches, MarketDial used what it misappropriated from APT to compare the companies. (Appx1302).

Both Thomke and Kursh relied upon FTI's court-ordered forensic examination of Stoddard's computers (Appx5679-715) to conclude Stoddard used the SDG for a pitch, sale or implementation for Lululemon. (Appx5510; Appx5583-86).

Thomke emphasized that MarketDial sought a "data dump" from Client of 1-2 years of APT Data Feeds. (Appx5082; Appx7191; Appx7374). Additionally,

[Client] downloaded APT's Data Feed of "waste" into its software in July 2017. (Appx5082-83 (cited Appx7448-51, RSOF ¶¶94, 100); Appx3192; Appx7304-05).

Kursh explained that Defendants misused APT's Customized Feed to provide work for [Client]. A document reviewed by FTI noted that Defendants "have received historical dump of data" from [Client] which they were "parsing, aggregating, transferring data into our product tables." (Appx5592-93; Appx5586). From this production, Kursh concluded that Stoddard used Customized Feed information for presentations to APT clients [Client] [Client] [Client] and [Client] (Appx5586-90).

### 9. Defendants Misused APT's Valuable Secrets For Unfair Competitive Advantage

By accessing APT's Secrets, a competitor could learn the business analytics business and develop competing tests without spending the years and money APT did. That competitor could develop software mirroring APT's and use it to capture business from APT. (Appx1303-04; Appx5064-65). Having APT's playbook "would tell a competitor where to focus resources (*e.g.*, successful variables for [Process], the need for [Processes]) and which mistakes to avoid." (Appx5064-65).

While APT took 16 years and [Dollar amount] to develop its Secrets, MarketDial had "a generally available product" from "almost day one." (Appx2168-69). Thomke concluded that "MarketDial could *not* have achieved the same results (product

development, market access) if it did *not* have access to APT's Compilation Trade Secrets," (Appx5051), which were unavailable from public sources. (Appx5066; Appx5086-88; Appx5338).

MarketDial gained "intrinsic knowledge" from the PCB, saving significant money and time. (Appx5573). Kursh concluded that MarketDial gained beneficial knowledge from specific PCB slides, including slides 32-33,[6] which provided granular detail about tests conducted by APT retail clients: "you can quickly learn what other retailers are doing with predictive analysis to improve revenues, increase profits, [and] provide better customer service." (Appx5550-52). Kursh added:

- Slide 35[7] showed MarketDial how to graphically illustrate incremental benefits and summarize tests. (Appx5558-59).

- Slides 40-41—which discuss the process for designing and implementing T&L— benefitted MarketDial "by mitigating the risks associated with unhappy subscribers due to unfulfilled expectations…" (Appx5568-71).

- Slide 43 showed MarketDial how APT aligns T&L with prospects' goals. (Appx5571-72).

- Slides 46-50 helped MarketDial develop business strategies, sales pitches, tactics, competitive analysis, and marketing, and described APT's unique use

---

[6]Appx6463-64.
[7]Appx6467.

of ▮Processes▮ to assess parameters and strategies. This was especially valuable since MarketDial's founders lacked the "'on the ground' experience in the predictive analytics software business to obtain this knowledge." (Appx5560-64).

Kursh stated that having PCB slides 58-59 saved MarketDial time and resources in vying for telecom and CPG business.[8] (Appx5554-57).

Thomke described how MarketDial's knowledge of how APT uses ▮▮ ▮Processes▮ enabled MarketDial to "dismiss other methodological attempts to achieve a similar outcome." (Appx5508).

Kursh emphasized that MarketDial pitched its software to prospects presuming it would obtain and use APT's Customized Feeds from those customers. (Appx5582) (giving Macy's and Signet as examples). This "saved MarketDial time and money," gained MarketDial credibility with subscribers by enabling it to achieve similar test results "at a much lower cost" and mitigated its risk of failed implementations. (Appx5582-83).

MarketDial profited at APT's expense. In November 2020, Davis touted that MarketDial was doubling its business from 2019, with "[n]early 100% . . . stolen from our competitor, APT." (Appx7356).

---

[8] Appx6489-90.

B.    **PROCEDURAL HISTORY**

On June 28, 2018, APT sued MarketDial for patent infringement and misappropriation of trade secrets. (Appx177-212). APT filed three amended complaints. (Appx260-309; Appx356-406; Appx667-732). Defendants moved to dismiss the second amended complaint, which the Court granted-in-part and denied-in-part, dismissing APT's patent infringement and unfair competition claims, but not APT's trade secret claim. (Appx407-42; Appx599-649). APT filed its Third Amended Complaint on July 27, 2021, adding Davis as a defendant and asserting a breach of contract claim against Stoddard and tort claims against Defendants. (Appx667-732), which Defendants sought to dismiss. (Appx733-54). The Court dismissed APT's contract and tort claims, finding tort claims were preempted by APT's trade secret claims. (Appx41-78). The Court again denied dismissal of APT's trade secret claims. (Appx41-78). MarketDial moved for summary judgment on these claims, which the Court granted on March 27, 2024. (Appx1-40). APT filed its notice of appeal on April 25, 2024. (Appx7707-10).

**SUMMARY OF ARGUMENT**

The Court rejected APT's Secrets clearly stolen by Defendants because it ignored substantial evidence presented at summary judgment and failed to accord APT reasonable inferences, as Tenth Circuit and Supreme Court precedent require.

If APT provided "some evidence" of the existence of any trade secret,[9] summary judgment had to be denied. APT submitted far beyond "some evidence" that its Compilations stolen by Defendants were each trade secrets, including substantial fact and expert testimony, and critical admissions by Defendants. Yet the Court erroneously found APT had no secret as a matter of law.

The Court's persistent theme—that APT dumped pages of documents on it without identifying what was secret—misstates the record and shows the Court misapplied the governing test. APT identified its Secrets, but the Court disregarded APT's evidence that created at least a factual dispute necessitating a trial. While the Court was required to consider each Compilation as a whole, it instead conducted a "bit-by-bit" inquiry regarding what was public and non-public in each. It compounded this error by flipping the burden—requiring APT to make this showing when the burden was on Defendants to show each Compilation was generally known or readily ascertainable, which they failed to do.

The Court rejected Secrets Defendants had not challenged, holding the full 67-slide PCB was not a trade secret, when Defendants only challenged an abridged, 28-page version.

The Court erroneously found the Utah Uniform Trade Secrets Act's ("UUTSA") disclaimer of particularity made no difference, relying on inapplicable

---

[9] *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp.2d 997, 1010 (D. Kan. 2004).

decisions that required particularity. The Court never explained why three volumes of zoning materials, permits and other public information qualified as trade secrets in *USA Power I*, but APT's Secrets, comprised of largely non-public information, did not.

The Court disregarded Defendants' acts of theft, yet these support that what they stole were Secrets, and that Defendants believed they were secret.

The Court erroneously rejected APT's contract claim, when contract provisions protecting client confidentiality made APT a third-party beneficiary.

Defendants knew they faced "disaster" if APT learned of their misconduct. The Court's errors, however, instead let Defendants profit from their theft, while visiting disaster upon APT, their victim. This must be rectified.

## ARGUMENT

### A.  Standard of Review

The Federal Circuit ("This Court") reviews a grant of summary judgment under the law of the regional Circuit. *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 968 (Fed. Cir. 2023). The Tenth Circuit reviews grants of summary judgment on trade secret claims *de novo*, drawing all reasonable inferences in the non-moving party's favor. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1128–29 (10th Cir. 2003).

Whether a trade secret exists is a question of fact. *Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*, 28 F.3d 1042, 1044 (10th Cir. 1994). Summary judgment is only appropriate if there is no genuine issue of material fact based on the material submitted. *Id.* Reversal is proper when the district court "made determinations of contested essential facts," including by ignoring evidence favorable to the non-movant. *Id.* at 1045. A plaintiff's burden on summary judgment is to specifically identify one trade secret on which it could recover for misappropriation. *See Ajuba Int'l, LLC v. Saharia*, 2014 WL 3520525, at *8 (E.D. Mich. July 14, 2014). In assessing whether APT's trade secret misappropriation claims were improperly dismissed, this Court applies Utah's trade secret law, including the UUTSA. *See Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1116 (Fed. Cir. 1996) ("Federal courts apply the trade secret law of the appropriate state."). The Tenth Circuit has not addressed the elements of a DTSA claim.[10] Where a regional Circuit has not addressed a non-patent issue, this Court will attempt to predict how that Circuit might decide an issue, including by looking at other Circuits. *See In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368-69 (Fed. Cir. 1999).

---

[10]It upheld dismissal of a DTSA claim in *Camick v. Holladay*, 758 F. App'x 640, 645 (10th Cir. 2018), but solely discussed the misappropriation element.

**B.** **APT's Evidence Demonstrated It Owns Protectable Secrets**

Both the UUTSA and DTSA define "trade secrets" to include compilations, where the owners have taken reasonable measures to keep such information secret and the information derives economic value by not being generally known. UUTSA, Utah Code §13-24-2(4); DTSA, 18 U.S.C. §1839(3).[11]

Under the UUTSA, a claim for misappropriation of trade secrets requires: 1) the existence of a trade secret, 2) communication of the trade secret to defendant under an express or implied agreement limiting disclosure of the secret, and 3) defendant's use of the secret that injured the plaintiff. *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F. 4th 1250, 1261 (10th Cir. 2022). Under the DTSA a misappropriation claim requires: (1) the existence of a trade secret, (2) the trade secret's misappropriation; and (3) the trade secret implicates interstate or foreign commerce. *dmarcian, Inc. v. dmarcian Europe*, *BV*, 60 F.4th 119, 141 (4th Cir. 2023).

Both Utah and Tenth Circuit law hold that a compilation may be a protectable trade secret, even where particular components (or, unlike here, all components) are in the public domain. *Harvey Barnett*, 338 F.3d at 1129. (Cited Appx18).

---

[11]APT reproduces relevant statutory provisions in its attached Addendum of Statutes.

### 1. **APT Demonstrated That Each Compilation Is A Trade Secret**

Both controlling Utah Supreme Court authority—*USA Power, LLC v. PacifiCorp.*, 235 P.3d 749 (Utah 2010) ("*USA Power I*")—and Tenth Circuit authority—*Rivendell*, 28 F.3d 1042—protect compilation trade secrets, requiring a court to focus on the whole compilation, rather than individual components.

In *USA Power I*, the Utah Supreme Court held:

> A unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. *A trade secret may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it.*

235 P.3d at 759 (cleaned up). It emphasized that "[t]o determine whether the product, design, or vision constitutes a trade secret" the trial court must conduct "an *intensely factual inquiry*." *Id.* Six factors from the *Restatement of Torts* §757 guide this analysis:

> 1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the

> information could be properly acquired or duplicated by others.

*Id.* at 760.

The Utah Supreme Court found that the trial court erroneously granted summary judgment because it assessed whether *individual components* of plaintiff's compilation were trade secrets, when the law requires "a trade secret analysis of the 'vision' as a whole.'" *Id.* at 759-61. It determined that plaintiff utility's three volumes of publicly-available zoning materials, permits and other documents were a trade secret that together contained plaintiff's "vision" and design for a nuclear plant that was neither known nor ascertainable to defendant. It found that, while the parties disputed the inferences to be drawn from the evidence, a jury could infer misappropriation because plaintiff presented evidence that defendant had access to its alleged trade secrets and its power plant was substantially similar to plaintiff's. *Id.* at 761-62.

Along similar lines, *Brigham Young Univ. v. Pfizer*, 861 F. Supp.2d 1320, 1323-24, 1327 (D. Utah 2012), denied summary judgment where BYU sufficiently established a trade secret in its "vision" for its Cox-2 inhibitor product. There, defendant had no active program to develop its own product before working with BYU, but afterwards introduced one that used BYU's materials.

The Tenth Circuit similarly recognizes compilation trade secrets. In *Rivendell*, 28 F.3d at 1044, the Tenth Circuit applied the same six-factor test to reverse a grant

of summary judgment. Plaintiff claimed its computer system was a combination trade secret and presented evidence that its system was the only one with which defendant had familiarity. *Id*. Nonetheless, the district court found no trade secret existed. *Id*. at 1045. The Tenth Circuit reversed, holding this determination "necessarily required the resolution of disputed facts" and, regarding misappropriation, also "a determination of credibility." *Id*. The Tenth Circuit rejected the district court's "bit by bit [examination] with the further requirement that Rivendell demonstrate the protectability of its elements of some of them rather than the protectability of its software system as a whole." *Id*. Finding that the trial court erred by requiring the two systems to be similar in some "protectable particular," it reaffirmed:

> "the general principle that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."

*Id*. (citation omitted). It found error because the district court, "refer[red] to unprotected elements or functions, and so would examine the separate elements rather than the combination." *Id.* at 1064.

The Tenth Circuit has underscored that "*Rivendell*'s requirement of analysis in the aggregate is more than a formality. It is a substantive component of trade-

secret analysis integral to a court's ultimate conclusion regarding the existence of material facts for trial." *Harvey Barnett*, 338 F.3d at 1130.

Here, MarketDial had no previous rival testing product, accessed APT's Secrets, and immediately rushed to market products that took APT years and [Dollar amount] to develop. Here, too, the Court erroneously fixated on "bits" of APT's compilations, while not analyzing APT's Compilations "as a whole."

### a. PCB

APT's evidence establishes the PCB is a compilation trade secret. Yet this Court may reverse without further analysis because Defendants, who bore the burden, never challenged the correct PCB. Defendants only contested a partial, 28-slide "PCB" that omitted its 40-page Appendix. *See* Appx6372 ("[T]he PCB is a 28-slide presentation which purportedly includes secret information relating to APT's 'corporate structure, capitalization, client locations, identity of clients, key benefits of "Test &Learn[.]' etc."). Defendants' "etc." skipped over 13 additional categories of trade secret information APT identified as covered by the 67-slide PCB Stoddard stole. (*See* Appx7434-35, RSOF ¶43).

The Court defined the abridged version as the "PCB," (*see* Appx7, citing Appx3732-60 (the 28-page version)) but then rejected that either the 28-slide *or the 67-slide* version presented trade secrets. (Appx28-30). The Court disregarded how the Appendix's 40 slides contributed to the whole PCB being a trade secret. Thomke

concluded that Appendix "sets forth 'rich technical information and company practices.'" (Appx5508, ¶31(f) (quoted in Appx7434-35, RSOF ¶43)). He emphasized secret information in slides 31-33, 46-51, 56-62. (Appx7434-36, RSOF ¶¶43-44). He explained how slides 46-50 depicted APT's ███ Plan ███ — "how ███ Processes ███ were repeatedly applied to find a distribution of ██ Result ██ ███ Result ███ which can be used to adjust variables and select control sites to achieve the most accurate outcomes"—which would enable a third party to "dismiss other methodological attempts to achieve a similar outcome." (Appx7434-35, RSOF ¶43).

The full PCB—Ex.144 (Appx6431-98)—plainly presents a compilation trade secret. (*See supra* Factual Background §3.a). The Court overlooked APT's claim that the PCB provides details about its T&L business model, including the user experience and how the user interacts with the software. (Appx28). Its 67 slides describe key attributes of that secret, including details about T&L's UI and adaptation to specific industries. (*See supra* Factual Background §3.a). It explains how T&L differs from other testing software both in methods and results. It pinpoints the correlation between the number of tests run and the statistical significance of results. (Appx6449). It compiles case studies specifying how APT solved client problems and increased profits. (Appx6457-59).

The PCB describes how APT serves customers across retail and other categories. APT's Experts identified individual PCB slides that contained valuable,

non-public information. (Appx5508-09; Appx5543-60). Every slide repeated that it was confidential APT property and that disclosure was prohibited. They concluded that the PCB (and other Secrets) were not generally known or readily ascertainable. (Appx5338; Appx5065-66; Appx5080-81). Defendants, despite their burden,[12] did not show otherwise.

### b. **Customized Feeds**

APT's Customized Feeds are also compilation trade secrets that show how after APT receives raw data from its customers, it "transforms" this, significantly increasing what could be learned using T&L. (*See supra* Factual Background §3.b)). Through its customization, APT can isolate how various attributes affect product sales.

The Court erroneously determined that APT had not shown this was valuable. The ▮Client▮ example disproves this. APT's evidence shows Defendants induced ▮Client▮ to disclose APT's Customized Feeds at a time they had no rival product. Defendants used APT's product to create MarketDial's product. By avoiding development costs, and using APT's Feeds to develop software providing information sought by ▮Client▮ Defendants were able to steal ▮Client▮ as a client.[13]

---

[12]*See infra* pp.56-57.

[13]A defendant who induces a third party to share a plaintiff's trade secrets may be liable for trade secret misappropriation. *See Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp.2d 440-41 (E.D. Pa. 2013).

### c.   SDG

APT's SDG is another compilation trade secret that demonstrates the technology that makes T&L software work.  (*See supra* Factual Background §3.c). It discloses confidential information about APT's logical architecture, server and software information, maintenance routines, security features, data centers, hosting facilities, and data transfers used for T&L. (*E.g.*, Appx1220-21; Appx5235-36; Appx5509-10).

### d.   Meta-Compilations

The Court erroneously described APT's inclusion of meta-compilations comprised of its individual Compilations as "abstract, post-hoc groupings and recombinations of other alleged trade secrets" generated for litigation. (Appx37, n.30; *see also* Appx19, n.7).[14] Instead, APT created its PCB and SDG—which embodied aspects of its overall T&L business model—years before litigation. Likewise, APT created its Customized Feeds long before suit. As he left McKinsey, Stoddard stole the PCB and SDG (Appx5692-94), and MarketDial induced clients to disclose APT's Customized Feeds. (Appx7303-06). Having these Secrets collectively increased Defendants' unfair competitive advantage.

---

[14] In *Coda Dev. S.R.O v. Goodyear Tire & Rubber Co.*, 2023 WL 2734684, *20 n.12 (N.D. Ohio Mar. 31, 2023) (Appx19, n.7), unlike here "there was no compilation of [plaintiff's] alleged trade secrets until after the case was filed."

### e. *USA Power I*'s Six Factors Favor APT

The Background facts show that APT's vision, methodologies, technologies and experience for its T&L business and software, as embodied in the Secrets, satisfy each of *USA Power I*'s six factors for establishing a compilation trade secret. Despite acknowledging this test (Appx18), the Court failed to properly apply it.

#### i) Not Known Outside APT's Business

APT's Experts concluded that none of APT's Secrets as a whole was public or readily ascertainable. (*E.g.*, Appx5338; Appx5381; Appx5065-66; Appx5080-81). Defendants did not show otherwise.

#### ii) Not Shared Broadly Within APT

Within APT, trade secrets are only shared on a need-to-know basis. Employees sign agreements precluding disclosure. When employees depart, they return confidential information and their access to APT's system is terminated. Hard copies of trade secrets are shredded; electronic data is segregated. (*See supra* Factual Background §4).

#### iii) APT Guards Secrecy

APT's Experts described APT's thorough efforts to safeguard secrecy. (Appx5343-70; *see supra* Factual Background §4). APT's contracts with McKinsey, BCG and ▮Client▮ forbade disclosure of APT's secrets. Stoddard admitted McKinsey's Confidentiality Agreement was "super comprehensive." (Appx7172). Each page of the PCB and SDG warned against disclosure. (*See* Appx6431-98;

Appx3724-31). The SDG warned that misuse would result in severe civil and criminal penalties. (Appx3726).

### iv)    Information Was Valuable

APT spent 16 years and `Dollar amount` developing and realizing its vision of predictive analytics business using T&L. (Appx5056-57; Appx5063-64; Appx5497). Mastercard's $600MM purchase of that business shows its value. APT's witnesses testified that having access to APT's Secrets saved Defendants millions of dollars and years of time in launching their competing product. This let MarketDial undercut APT, and enabled MarketDial to either mimic aspects of APT's products or differentiate itself from APT. (Appx5233-36; Appx5297-300; Appx5314-15; Appx5064-65; Appx5080-81; Appx5088-89). Without using APT's trade secrets, MarketDial would have failed. (Appx5222; Appx5051; Appx5065-66; *see supra* Factual Background §§5, 6).

### v)    APT Spent Substantial Time And Money Developing

*See supra* Factor iv.

### vi)    Defendants Could Not Have Duplicated Compilations Without Theft

Defendants were forbidden from copying each Compilation. (*See supra* Factors i, iii, iv). APT's witnesses explained that APT's Secrets were not public and, absent Defendants' improper disclosure, could not have been duplicated. Defendants submitted no contrary evidence, despite their burden. Instead, Defendants plucked

information from within each Compilation they claimed contained public information but could not and did not show each Compilation as a whole was public. (Appx5065-66).

## 2. APT Demonstrated Its Secrets Are Confidential

APT's Confidentiality Agreement with McKinsey required confidentiality for the PCB and SDG (as did Stoddard's McKinsey employment agreement). APT's agreement with BCG similarly prohibited Davis from using anything learned there about APT. APT's agreements with ▮Client▮ and other clients prohibited disclosure of Customized Feeds. (*See supra* Factual Background §4).

Defendants flouted these restrictions. Stoddard sent Davis APT's PCB, using a wink emoticon, telling him "you didn't get this from me." (Appx3915). Stoddard knew they faced "a disaster" if APT found out and sued. (Appx7172).

## 3. APT Demonstrated Defendants' Misuse Of Its Secrets And Resulting Injury

APT presented overwhelming evidence of Defendants' misappropriation of APT's Secrets under both the UUTSA and DTSA, (*see* Statutory Addendum), including:

> a)     Davis and Stoddard planned to form a rival analytics business while Stoddard was working with APT at McKinsey;

b)  Stoddard knew APT had a protectable interest in preserving nondisclosure of the material tendered to McKinsey because:

   (i)   the APT-McKinsey contract so provided,

   (ii)  each page of the PCB and SDG prohibited disclosure, and

   (iii) the SDG warned that disclosure would result in civil and criminal penalties;

c)  Stoddard sent Davis APT Compilations before ever working with APT, contemporaneous with MarketDial's formation;

d)  Stoddard induced APT to provide him confidential information by promising to get it into the "right hands" at McKinsey to advance their partnership;

e)  right before leaving McKinsey, Stoddard clandestinely downloaded APT's PCB and SDG, among 6,494 files he stole (Appx5692-94);

f)  Stoddard repeatedly accessed APT Secrets while developing MarketDial's methodology and approach; and

g)     MarketDial used APT's Customized Feed for **Client** to create its rival product.

MarketDial's lack of prior business, improper access to APT's business model and introduction of a like software and business model as APT shortly thereafter, with essentially no independent research and development, is enough to reach a jury. *See USA Power I*, 235 P.3d at 761 ("We hold that a jury can infer misappropriation under the [UUTSA] if presented with circumstantial evidence that shows access to information similar to the trade secret at issue.")

### 4.     Defendants Injured APT

APT's Experts, Thomke, Kursh, and Smith, concluded that stealing APT's Secrets saved MarketDial years of time and tens of millions in launching its competing product, which it could not have had otherwise. By knowing APT's blueprint for success, MarketDial avoided having to learn by trial and error, and could quickly create a product mimicking APT's. MarketDial unfairly stole **Client** as a client by repackaging APT's work product as its own and selling it for less. (*See supra* Factual Background §§3.b, 8, 9).

### C.     The Court Disregarded APT's Evidence And Made Other Reversible Errors

APT presented evidence sufficient to merit a trial. Yet the Court granted summary judgment because of several independent errors. *First*, the Court improperly held APT to the higher burden of proof imposed on a trade secret plaintiff

*at trial*, and flipped burdens. *Second*, the Court misapplied the law governing compilation trade secrets, demanding proof of which individual components in APT's Compilations were secret, while ignoring each Compilation as a whole. *Third*, while acknowledging that the UUTSA disclaims particularity, making it easier to establish a trade secret than under the DTSA, the Court held this made no difference. *Fourth*, the Court ignored that Defendants' malicious conduct provided evidence that APT's trade secrets were valuable and not readily ascertainable. *Fifth*, the Court dismissed APT's contract claim even though Stoddard admitted his contract prohibited his conduct toward APT.

### 1. The Court Ignored APT's Evidence And Denied APT The Benefit Of Inferences

While APT presented ample evidence establishing each Secret and its misappropriation by Defendants sufficient to defeat summary judgment, the Court ignored or misread it, and denied APT the benefit of reasonable inferences. In rejecting APT's Experts' and fact witnesses' clear testimony and documents, the Court improperly weighed evidence against APT, alone requiring reversal. *See Forth v. Laramie Cty. Sch. Dist. No. 1*, 85 F.4th 1044, 1050 (10th Cir. 2023). The Court— four times—emphasized that APT was not entitled to any presumption, but APT never asked for one. APT's evidence showed why the whole PCB, Customized Feeds and SDG were trade secrets. Despite APT's targeted presentation, the Court erroneously suggested that APT "place[d] on the doorsteps of the court" volumes of

material and insisted that "bits and pieces" of information "somewhere" therein constituted a trade secret. (Appx21).[15]

### a. __PCB__

While acknowledging in its subheading that APT claimed the PCB itself presents a trade secret (Appx28), the Court held "it remains unclear what APT is claiming as a trade secret . . . ." While the whole PCB is indisputably non-public, the Court improperly required APT to show what *within the PCB* was non-public. (Appx28-30). It agreed that Kursh provided a "somewhat detailed walkthrough" of the PCB—running 59 paragraphs—but erroneously faulted APT for not identifying what "therein" was non-public. (Appx29-30). This ignored evidence that the whole PCB was non-public and that its individual slides contain non-public, valuable information which cumulatively constitute a trade secret. (Appx1648-49; Appx2834-35). Kursh explained how these slides show the innerworkings of APT's business, including that they:

- "provide[] critical information on how APT meets the needs of specific industries" and how retailers use APT's solutions (Appx5543-44);

- list critical business issues that a vendor could ask prospective retail customers (Appx5544-45);

---

[15]*See also* Appx14 ("It is inappropriate to simply produce voluminous amounts of information and 'ask[] the district judge to parse through to determine what seem[s] valuable and generally unknown[.]).

- list case studies showing how APT benefited retail customers (Appx5546-51); provide APT sales and software design information for telecommunications and CPG customers (Appx5552-57);

- demonstrate how to graphically illustrate incremental benefits and summarize tests (Appx5558-59);

- demonstrate how T&L identifies store characteristics associated with superior performance (Appx5559-60);

- include slides that explain APT's ██Processes██ process and how it measures "██result██" (Appx5560-64)[16];

- describe APT's methods for reaching customer personnel uninvolved with analytics (Appx5567); and

- show steps for rolling out T&L. (Appx5569-73).

While Kursh cited Stoddard's download of the PCB the day before leaving McKinsey as evidence of how Defendants used APT's Secrets as a "masterclass," the Court erroneously dismissed as "total non sequitur" that this evidenced the PCB's value. (Appx29, n.18) (citing Appx5540). But being willing to risk criminal liability and court "disaster" to steal a rival's compilation to start a competing

---

[16]While Kursh analyzed five slides to explain this, the Court erroneously found that APT did not show what made APT's ██Processes██ unique. (Appx29, n.19) (citing Appx5561).

business inherently demonstrates that the stolen information has value. The Court denied APT the benefit of such inferences.

The Court agreed that Kursh "arguably c[ame] closer" in establishing value in paragraphs 306-11 of his Report—which describe how the PCB "provides the steps necessary for a vendor to compete in the various sectors" and makes MarketDial appear credible despite lacking experience—but erroneously found this insufficient, concluding Kursh had not explained "the dimensions of the secret" or shown it was non-public. (Appx29, n.18) (citing Appx5233-35). This was incorrect. APT provided evidence that the PCB was confidential. This included testimony from APT corporate representative Will Weidman. (Appx2866-67 (cited Appx7439, RSOF ¶46b (testimony that PCB, SDG were non-public)); *see also supra* Argument, §B.1.a). Yet the Court insisted APT show which elements were public and non-public, when the burden was Defendants to show the whole was public.[17] Regarding "dimensions of the secret," Kursh discussed a chart through which MarketDial learned eight categories of tests APT used for manufacturing and retail industries.

This also denied APT inferences. The Court stated that APT provided "equivocal, abstract, or off-point" evidence of the PCB's "value proposition," citing Kursh's Report (Appx5233-35 (cited Appx28-29 & n.18)). Instead, Kursh's testimony was specific and on-point. He testified that the PCB "provides the steps

---

[17]*See infra* pp.56-57.

necessary for a vendor to compete in the various sectors," including how to build tests that customers would regard as "must have[s]." (Appx5233-34). From this, they would know how to estimate costs to build such tests and perform the functionality necessary to compete in a sector. (Appx5234). The fair inference is that the PCB was valuable.

Similarly, the Court denied APT the rightful reasonable inferences flowing from Thomke's Supplemental Report, finding this failed to provide sufficient evidence for a factfinder to conclude information was non-public and valuable. (Appx28, n.17) (citing Appx5508-09). Yet, in that paragraph, Thomke pinpointed 54 PCB slides containing confidential information, including case studies. He testified that the whole PCB presented a "unique integration of . . . information" that was non-public. (Appx3240; Appx5065-66; Appx5068-69; Appx5070-72). Again, the fair inference in APT's favor was the opposite of the Court's finding.

While Thomke noted that the PCB reflected APT's usage of optimal control groups, (Appx5069-72), the Court found he did not "thread the needle" and show how it offered not-generally-known techniques or value. (Appx29, n.18). This ignored Thomke's explanation that "[t]he ███ Technique ███ …is fundamental to APT's trade secrets and software product," and detailed this process, which included identifying thousands of ██Category██ attributes to ███ Result ███, which APT then tests via "hundreds of thousands of simulations on customer data." (Appx5069-72).

## b. Customized Feeds

With Customized Feeds, too, the Court improperly shifted the burden to APT to show what was public and non-public. (Appx36, nn.28-29). It overlooked that clients signed contracts with APT prohibiting disclosure of Customized Feeds. (*See* Appx7450, RSOF ¶96 (citing Appx4784-804)). It ignored that Defendants induced customers to send them the Customized Feeds and provided no evidence that APT's Customized Feed for any client was public.

Citing Defendants' Motion, the Court erroneously stated APT did not explain how its "data-modification process" differed from "the data feeds themselves." (Appx36, n.29). Instead, APT's abundant evidence showed how APT's Customized Feeds "transformed" client data by ██Action██, ██Action██ and ██Action██ data. (*See* Appx5277-78; Appx5079-80; *see generally* Appx7448-51, RSOF ¶¶94-95, 98, 100).

As an example of denying inferences, the Court cited 38 pages of Expert Reports which explained why Customized Feeds are trade secrets, along with testimony and interrogatory answers, [18] yet described this as "cursory," "imprecise" and not "parsing out" the secret."[19] This misapprehends this evidence. For example,

---

[18] *See* Appx35-36 (citing Appx1283); Appx36, n.29 (citing Appx5285-316, Appx5078-85) and Appx36, n.28 (citing Appx3380-81, Appx3390, Appx3398).

[19] The Court noted that Defendants did not have seven documents that APT referenced to explain its Customized Feeds (Appx35-36), missing APT's point that evidence demonstrated that Defendants sought and used the Customized Feeds themselves for ██Client██, ██Client██, ██Client██ and others (Appx35 & n.27). (*See* Appx7448-49, RSOF ¶ 94, Appx7451-52, RSOF ¶¶ 100-102).

in the cited pages from Kursh's deposition, he testifies that MarketDial benefitted in its implementations by having APT's implementations for **Client** (Appx3380-81), and that APT's data feeds would have customer information "in terms of their different sites, in terms of transactions, in terms of all of those other variables that APT knew or learned of from trial and error of significant investment from learning what to do and what not to do." (Appx3390). The fair inference is that MarketDial profited from its theft.

The Court elsewhere seemed to acknowledge this, noting APT's Experts concluded that through misappropriation, MarketDial learned APT's "knowhow," enabling MarketDial "to both glean a sense of key data inputs as to particular clients for its software platform . . . thereby bypassing costly trial and error processes." (Appx35, n.27). However, the Court gave no weight to this.

The Court misread Kursh's example of APT using **Category** data, concluding that he did not identify "*what*, in particular, was requested," why it was non-public or how it generated value. (Appx36, n.29) (citing Appx5285-86). Instead, Kursh specified that APT asked, *inter alia*, for "the **category** and **time** for **Action** **Action**, **Finances** by type, **Time**, [and] **Action** elements . . . ." (Appx5285). He concluded this helped track "the actual loss of revenue to a business during the **Time**" (Appx5285-86), demonstrating its value.

The Court acknowledged that APT identified "some of the data points" Defendants requested from █Client█ (Appx35, n.27) (citing Appx5184-87), and appeared to agree that these constituted trade secrets, but then faulted APT for not disclosing "the actual data points *that would have constituted trade secrets in the data feeds of **other clients***." (Appx35, n.27) (emphasis added). Yet the █Client█ theft alone should have sufficed to defeat summary judgment. Regarding █Client█, the Court overlooked 17 paragraphs in Kursh's Report detailing data Defendants requested from █Client█ showing APT's customization efforts and how APT expanded the categories it analyzed over time, adding new █Information█, █Classification█ attributes and █Specific data█, which led to discoveries, including where best to █Action█ █Action█ (Appx5287-97 (cited Appx7462-63, RSOF ¶152)).[20]

### c. SDG

The Court ignored substantial evidence of the SDG's value in demonstrating the unique technology APT uses to deliver T&L to clients. The Court focused on whether individual slides in the SDG were trade secrets, ignoring that the whole SDG was a Secret.

Thus, the Court ignored Weidman's testimony that the SDG's "totality" is the trade secret. (Appx2525). Weidman explained that the valuable and non-public

---

[20]Kursh's Supplemental Report further detailed how MarketDial benefitted from misusing the Customized Feeds. (Appx5581-83 (cited Appx7448-49, RSOF ¶94, Appx7451, RSOF ¶ 100)).

information in the SDG included APT's choices of ███████, ████████████
and ██████████, which each involved different tradeoffs and implications.
(Appx2525-26). It described APT's unique approach and cadence of monitoring,
including uptime happening at ██████ intervals (Appx2529). It described the
duration and scope of APT's installation. (Appx2529). It discussed data center
security protocols, including two-factor authentication and video coverage.
(Appx2526-27). (Each noted in Appx7430-31, RSOF ¶32).

While the Court noted that APT corporate representative Holmes testified
that SDG's UI was unique in its choices to use a ██████████, ████████████, and
██████████ (Appx26-27) (citing Appx2648-49), the Court faulted APT for
not showing how this was not readily ascertainable or providing additional details.
(Appx27). However, Holmes testified that APT had a unique design and
functionality, including the ████████████, and that other providers did not use
the same configuration. (Appx2648-49). It was not APT's burden to show this was
not generally known or readily ascertainable (*See infra* pp.56-57).

The Court isolated a fragment of Holmes' testimony where he states that the
SDG shows APT's system is "'highly available…performing…monitored
correctly,'etc." and found this fell below the trade secret standard (Appx27, n.15)
(citing Appx2654), and also ignored Holmes' testimony identifying unique and
valuable information in the SDG. Holmes testified that this included that APT used

Standard audits and Protocol for its data centers. (Appx2653-54). It also included APT's unique password security, including use of Security Measure and Security Measure. (Appx2650-51 (cited Appx25, n.13)). It included APT's data retention practices, which affect the recovery of client data. (Appx2651 (cited Appx7430-31, RSOF ¶32)).

Looking only at isolated paragraphs and denying APT the benefit of inferences, the Court criticized Kursh's analysis of the SDG, too, as cursory. (Appx25-26, n.14) (citing Appx5235-36). Yet, in paragraph 315, Kursh explained that "[t]he [SDG] disclosed confidential information about APT's architecture, deployment, implementation, security and client relationships" and, in Paragraph 316, explained how it would benefit a competitor to know "the Amount architecture, data practices and security that it would need to satisfy customers . . . ." (Appx5236). Likewise, the Court cited paragraphs 129-30 of Kursh's Supplemental Report, but ignored paragraphs 125-127, where Kursh emphasized that Stoddard downloaded the SDG to his hard drive upon leaving McKinsey and used it at MarketDial,[21] and paragraph 128, where Kursh explained how MarketDial could use an SDG slide showing APT's typical timelines for a software rollout to sell its rival product. (Appx5583-85). The Court also ignored Kursh's deposition testimony regarding

---

[21]FTI's court-ordered forensic examination of Stoddard's computer activity confirmed his theft. (Appx5687-88 (cited Appx7433, RSOF ¶¶39, 41)).

why the SDG is a trade secret. (*See* Appx3367 (SDG shows APT uses a "███type███ ███type███"); Appx3396-97 (explaining why "this kind of information is critical to enterprise companies when you are selling them software or licenses or subscriptions" and addressing each category (cited Appx7430-31, RSOF ¶32))).

The Court misstated Thomke's conclusions regarding the SDG, stating he did "nothing more than reference" the SDG and refer to its "broad classes of information." (Appx26, n.14) (citing Appx5509-10). Instead, Thomke summarized that the SDG "provides client partners with a technical overview of the APT 'Software-as-a-Service solution'" and emphasized that FTI confirmed that Stoddard misused the SDG, which "permitted MarketDial to unfairly compete" and damage APT. (Appx5510). While the Court acknowledged Thomke's testimony that the SDG disclosed "the technical architecture" and "what the data center should look like, what protocols to use, ███Conditions███, ███Conditions███, ███Conditions███" (Appx25, n.13) (citing Appx3257)—obviously valuable information—it found this "a far cry from clearly delineating the secret and its independent economic value." (Appx25, n.13).

The Court further denied APT the benefit of inferences by stating that its witnesses "equivocated on . . . whether the practices outlined in the SDG were generally known or readily ascertainable." (Appx25, n.13) (citing Appx2527-28)). Instead, Weidman, without equivocation, testified that APT kept the information in

the SDG "proprietary and confidential," noting in the answer that immediately followed "[m]ost software companies would not disclose architecture, what type of databases were used, what types of security protocols, what types of file formats without having an NDA…." (Appx2528).

### 2. The Court Erroneously Imposed On APT The Burdens Of A Trade Secret Plaintiff At Trial

The Court erroneously required APT to meet the burdens imposed on a trade secret plaintiff *at trial*—not the lesser burden imposed on such a plaintiff opposing summary judgment.

Tenth Circuit courts hold that to defeat summary judgment in trade secret cases, a plaintiff must only produce "some evidence" that the information disclosed to defendants meets the definition of a trade secret. *Dodson*, 347 F. Supp.2d at 1010; *see also OsteoStrong Franchising v. Richter*, 2020 WL 4584007, at *5 (D.N.M. Aug. 10, 2020) (citation omitted).

Despite acknowledging that the law "does not demand that the plaintiff prove its case at summary judgment" (Appx17), the Court placed trial burdens on APT, relying on two trade secret trial decisions—*Bimbo*, 39 F.4th at 1262, and *USA Power, LLC v. Pacificorp.*, 372 P.3d 629, 649-50 (Utah 2015) ("*USA Power II*").[22]

---

[22]In *Bimbo*, the Tenth Circuit reversed a jury verdict for a trade secret plaintiff, finding the district court should have granted a renewed motion for judgment of law. (Appx16). In *USA Power II*, the Utah Supreme Court affirmed a jury verdict for a

*See* Appx13 (citing both to hold "[t]he plaintiff bears the burden of *proving the existence of a trade secret* and there is no presumption in [its] favor.") (emphasis added); Appx11 (citing *USA Power II* for what is necessary **for a jnov, not summary judgment** to hold that a plaintiff must inform factfinder "'*what it is that the plaintiff claims is not generally known* or readily ascertainable'")[23]; Appx18 (citing *USA Power II* to hold that demand for specificity "is particularly pronounced where, as here, compilation trade secrets are at issue")[24]; Appx21 (citing *USA Power II* to hold that a plaintiff must identify what it "'*claims* is 'not generally known or readily ascertainable'"); Appx24 (citing *USA Power II* in concluding that Utah law's lack of a particularity requirement is immaterial); Appx25, n.13 (finding APT had to "outline[] how this compilation itself is protectable under the standards delineated in *USA Power II*"); Appx22, n.9 (citing *Bimbo* to speculate that the evidence APT presented might cause a verdict in its favor to be "ripe for a meritorious motion as a

---

trade secret plaintiff. The Court also relied on *Sw. Stainless, Ltd P'ship v. Sappington*, 582 F.3d 1176 (10th Cir. 2009) (Appx11), which reversed a bench trial award for a trade secret plaintiff.

[23] The Court also cited this at Appx15, Appx17, Appx24-26.

[24] *USA Power II* there referred to *USA Power I*, 235 P.3d 749, but neither required specificity in compilation cases nor held any need was "particularly pronounced." Instead, each held that a plaintiff must define trade secrets sufficiently to satisfy UUTSA requirements. *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) (cited Appx15-16, n.6, Appx18)—a post-trial decision—does require "reasonable particularity" in compilation cases under Kentucky law, but Utah law does not require particularity.

matter of law"); Appx30 (speculating that a verdict for APT "would be vulnerable for much the same reasons as in *Bimbo Bakeries*").[25]

By erroneously relying on the trial standard, the Court improperly shifted Defendants' burden to APT. It required APT to show what components of its Secrets were public and non-public, when the law requires *movant* to show the Compilation is public. Thus, in *Bimbo*, 2017 WL 3089011, at *4 (D. Utah July 20, 2017), the district court denied summary judgment where a trade secret defendant could not show a compilation was generally known, holding that "[a]s the moving party, it is U.S. Bakery's burden to show that the compilation of individually generally known processes is also generally known" and noting that movant had not argued that the compilation was generally known.[26] By contrast, here, the Court required APT to "inform the fact-finder of 'what it is *that the plaintiff claims is not generally known or readily ascertainable*." ((Appx11) quoting *USA Power II*). The Court held APT to burdens applicable if it went to trial, while denying it the opportunity to do so.

---

[25]The Court cited *Water & Energy Sys. Tech., Inc. v. Kell*, 974 P.2d 821 (Utah 1999), to hold that "[a]t summary judgment there is 'no presumption' of a protectable trade secret to a plaintiff's benefit . . . ." (Appx17). That case concerned a preliminary injunction and not summary judgment. APT never relied upon a presumption. Instead, APT established its Secrets through abundant evidence.
[26]In another decision, the *Bimbo* district court denied summary judgment for two defendants, noting that while plaintiff bore the burden of demonstrating misappropriation at trial, "[o]n summary judgment, however, the moving party has the burden of proving that there are no disputes of material fact about whether the trade secret was misappropriated." *Bimbo Bakeries v. Sycamore*, 2017 WL 1405637, at *4 (D. Utah, Apr. 12, 2017).

### 3. The Court Ruled For Defendants Regarding A Critical Trade Secret They Never Challenged

Even though Defendants never challenged the full PCB—Ex.144 (Appx6431-98)—but instead only a partial, 28-page version (Appx3732-60), the Court held the larger Compilation was unprotectable. (Appx28-30). This was error, as the Court never gave APT notice of that intention or opportunity to respond. *See Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1148 (10th Cir. 2023); *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150-51 (10th Cir. 2017) (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not.")).

### 4. The Court Erroneously Failed To Consider Whether APT's Compilations As A Whole Were Trade Secrets

The record confirms that APT presented abundant evidence that each Compilation as a whole was not generally known or readily ascertainable,[27] but the Court erroneously disregarded this. Instead—while *USA Power I* and *Rivendell* forbid this— it went "bit by bit" through APT's Compilations, requiring APT to show which individual components of each were trade secrets, while disregarding each as a whole.

---

[27] *See* Appx5338-39; Appx5065-66; Appx5068-69; Appx5070-72; Appx5080-81.

Thus, the Court faulted APT for not identifying "*what aspects* of each compilation is already known within the industry (or otherwise readily ascertainable) . . . ." (Appx20 (emphasis added)).[28] Regarding the PCB, the Court held that APT failed to "identify what information *therein* is or is not generally known or readily ascertainable." (Appx29) emphasis added)). Similarly, it found "unclear what APT is claiming as a trade secret: is it claiming the use of such **Processes** or some particular methodology supposedly *disclosed in the* [PCB]?" (Appx28 (emphasis added)).

Regarding Customized Feeds, the Court faulted APT for "fail[ing] to identify what parts of voluminous documents . . . aren't part of the secret, might not be generally known within the industry, or aren't readily ascertainable." (Appx21; *see also* Appx36, nn.28-29).

Ignoring the whole SDG, the Court faulted APT for not "delineating the boundary of what, exactly, *is secret therein*." (Appx25) (emphasis added).

Irrespective, despite not bearing this burden, as shown above, APT satisfied it. Kursh concluded that no Secret was readily ascertainable by Defendants. (Appx5338-39; Appx5380-81). He explained why the PCB and SDG presented

---

[28]*See also* Appx20 (APT's materials "do not meaningfully identify *what* in each trade secret **ought to be picked out of the compilation** as generally known or readily ascertainable.") (bold added).

confidential trade secrets. (Appx5386-87 (PCB), Appx5385 (SDG)). Regarding Customized Data Feeds, he concluded "while some of these data inputs may be generally known, it was APT's specific data inputs and requirements that are confidential and proprietary." (Appx5285; *see also* Appx5285-86 (detailing same).

For the applicable standard to assess trade secrets, the Court heavily relied on *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002) (Appx12-15; Appx30)[29]—*which did not concern compilations[30] or Utah or Tenth Circuit law*. There, two Epic employees who managed IDX software for a foundation transferred information about IDX's systems' operations to Epic. While the opinion states that the features of IDX's software are described in a 43-page document, critically, that document *was solely created for the litigation* and was not possessed by defendant. *Id.* at 584.[31] Since this post-litigation document was supposed to enumerate trade secrets, it made sense for the Seventh Circuit to stress that it included items that were

---

[29]Cited Appx12-15, Appx13, n.5. The Court noted that "[v]irtually every circuit court has elected to follow Judge Easterbrook's reasoning in IDX…" (Appx15). The Tenth Circuit has not done so.

[30]Further showing that *IDX* is inapposite, the Seventh Circuit's standards for compilation trade secrets parallel the Tenth Circuit's. *See 3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("a trade secret can exist in a combination of characteristics and components, each of which is, by itself, in the public domain.") (citing *Synthex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983)).

[31]Later Seventh Circuit courts have found *IDX* inapplicable where, as here, a plaintiff identifies specific documents a defendant stole. *See Motorola Solutions, Inc. v. Hytera Comm'ns Corp.*, 495 F. Supp.3d 687, 698 (N.D. Ill. 2020) (defendant stole 21 separate documents which, together, constituted the "playbook" for building radio devices).

not trade secrets and did not properly identify what was. Yet here, Defendants stole and used the PCB. Thus, the Court's conclusion that the PCB was "akin" to the post-litigation creation in *IDX* was fallacious. (Appx30). While *IDX* held that, "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition," *IDX*, 285 F.3d 584, this was because certain parts of that post-litigation submission, such as algorithms, appeared to be trade secrets, while others did not. *Id*. Here, each Compilation as a whole is a trade secret.[32]

The Court relied upon several other inapposite cases; none concerning compilations. In *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022) (Appx14), plaintiff claimed defendant stole its designs for its actuator prototype. However, the Seventh Circuit found that grouping was vague and included material plaintiff had conceded was already public. In *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167-68 (9th Cir. 1998) (Appx14), plaintiff claimed that all its "dimensions and tolerances" of its rolling loop motion picture product were trade secrets, without explaining why. In *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 772-73 (4th Cir. 2023) (Appx14-15), a declaratory judgment action, defendant claimed a trade secret in vulnerabilities it identified in open-source code but could not show this had

---

[32]In *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46 (1st Cir. 2020) (Appx15, n.6), plaintiff admitted it could not identify what in its customized reports were trade secrets. Here, APT did identify that for its Secrets.

value. In *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 707-708 (Fed. Cir. 2021) (Appx16, n.6), this Court reversed a jury verdict for a trade secret plaintiff, where defendant provided proof that alleged trade secrets were disclosed in patent applications and plaintiff admitted prior art existed. *See also Givaudan Fragrances Corp. v. Krivda*, 639 F. App'x 840, 843 (3d Cir. 2016) (Appx15, n.6) (upholding summary judgment for defendant where plaintiff did not identify ingredients for stolen fragrance formulas).

In *Dodson* (Appx16), the court considered whether customer lists and information—not compilations—were trade secrets. 347 F. Supp.2d at 1010-11.

*Utah Medical Products v. Clinical Innovations*, 79 F. Supp.2d 1290 (D. Utah. 1999) (Appx15-16), too, did not concern compilations. Instead, defendant took 17,000 pages of documents regarding business strategy, market analysis and other matters. *Id.* at 1311. Plaintiff's claim failed because it did not identify which pages were trade secrets.[33]

Because it erroneously believed APT had to show which components of its Compilations were trade secrets, the Court appeared to become exasperated, believing it was being asked to search for "bits and pieces of information" that could

---

[33]*Utah Medical* held plaintiff bore the burden of showing what was not readily ascertainable at summary judgment. *Id.* at 1311. As discussed above, *Bimbo*, 2017 WL 3089011, more recent authority specifically regarding compilations, holds otherwise. Irrespective, APT provided substantial evidence that its Compilations were not readily ascertainable by Defendants. (*See supra* Argument §1.e.1)).

be a trade secret, like a "pig[] hunting for truffles" (Appx21-22).[34] Instead, APT's Compilations were indeed presented. Indeed, the Court chided APT's expert for arguing that proper consideration was of the "overall compilation" (Appx25, n.13), when the law required this.[35]

### 5. The Court Erroneously Concluded That Utah's Disclaimer Of Particularity Was Immaterial

Under Utah law, a plaintiff is "not required to identify its trade secret with particularity," *USA Power II*, 372 P.3d at 649,[36] including at summary judgment. *See Surgenex, LLC v. Predictive Therapeutics*, 462 F. Supp. 3d 1160 (D. Utah 2020) ("the [UUTSA] does not contain a particularity requirement at any stage of the litigation"). The Court agreed that federal law "clearly demands a much higher degree of particularity and specificity in the demarcation of trade secrets." (Appx24, n.10). This makes establishing a trade secret easier under Utah law. (*See* Appx24 (acknowledging Utah law is "seemingly more lax")); Appx23 (acknowledging

---

[34]The quote comes from *Rocky Mt. Wild Inc. v. U.S. Forest Serv.*, 56 F.4th 913 (10th Cir. 2022), a FOIA case, where plaintiff failed to justify an exemption. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531 (10th Cir. 1995), is a gender discrimination case where plaintiff lacked record cites. In *Salt Lake City v. Kidd*, 435 P.3d 248 (Utah 2019), plaintiff failed to identify which constitutional right was violated by her arrest. (Each cited Appx22).

[35]The Court erroneously suggested that APT "string-cite[d] exhibits" (Apx22), when APT responded to 171 paragraphs with pinpoint cites and detailed explanations. APT's transparency was the opposite of waiting to "show its hand" about its Secrets until it reached the jury. (Appx22, n.9).

[36]While the Utah Supreme Court was clear regarding particularity, the Court described Utah precedent as having "some lack of clarity." (Appx23).

"arguable divergence" between Utah and federal law regarding particularity));
Appx12, n.4 (same)).

Despite disavowing that it was "rely[ing] on a demanding particularity requirement" in considering APT's UUTSA claim (Appx23), the Court relied on federal law requiring particularity to find APT failed its burden. (*See* Appx18-19 (*citing SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) (holding "the combination itself must be delineated with some particularity in establishing its trade secret status")).[37] *See also* Appx14 (citing *Imax* to hold that the plaintiff must identify the trade secret "with *sufficient particularity*").

Relatedly, the Court insisted APT demonstrate specificity. (*See* Appx15 ("a demand for specificity" of trade secrets at summary judgment "has become a matter of practical consensus in American trade secret law"); Appx18 (noting the "latent demand for specificity" "baked into the uniform trade secrets statutory definitions…"); Appx9 (private action under UUTSA "does much the same" as

---

[37] In *SL Montevideo*, a manufacturer which supplied a customized motor to defendant failed to show that defendant breached a contract by obtaining a motor elsewhere. While evidence existed that plaintiff sent defendant engineering drawings and specifications, plaintiff never submitted this into evidence. Moreover, the manufacturer abandoned its trade secret claim on appeal and solely proceeded on a contract theory.

under DTSA)). As particularity and specificity are interchangeable, this created the same error.[38]

The Court disregarded *USA Power I*'s dictate, 235 P.3d at 760, and did not consider APT's Secrets as a whole. It did not grapple with *USA Power I*'s facts or explain why the PCB, Customized Feeds and SDG here were any less protectable compilations than was the three-volume compilation of public materials there.

Because the Court believed the UUTSA and DTSA claims required equivalent proof, it considered both claims together. (*See* Appx12 (noting similar definitions in Utah and federal statutes "invite[] consideration" of both claims "in tandem")). It discussed no way that Utah's laxer standard for establishing a trade secret made any difference. Instead, it put Utah's particularity requirement "to one side" (Appx24), and erroneously held APT failed to define its Secrets.

### 6. The Court Disregarded That Defendants' Misappropriation Evidenced Trade Secrets

The Court only discussed misappropriation regarding the SDG, expressing "grave doubt that APT has adduced . . . that the information claimed as [the SDG] was misappropriated or used." (Appx27, n.16). Again, it was not APT's burden to "adduce" misappropriation at summary judgment, but Defendants' burden to show otherwise. APT met this anyway: APT showed Stoddard stole the SDG and PCB

---

[38] *See* www.merriamwebster.com/thesauraus/particularity ("specificity" is first synonym for particularity).

while at McKinsey and used them while at MarketDial, and that Defendants induced APT clients to send the Customized Feeds.

The Court's disregard of misappropriation was material because, while Defendants' malicious acts cannot be *the only* basis for establishing the existence of APT's trade secrets, *USA Power II,* 372 P.2d 629 n.67, they can, as here, be *some evidence* of this. One does not risk their job, savings or freedom—as Stoddard did—to steal something readily ascertainable or worthless.

### 7.     The Court Erroneously Dismissed APT's Contract Claim

The Court also erroneously dismissed APT's breach of contract claim against Stoddard, incorrectly holding that Stoddard and McKinsey did not intend for APT to be a third-party beneficiary of their Confidentiality Agreement. To be a third-party beneficiary under Utah law, a party must be an "intended," not "incidental," beneficiary of the contract, as shown by its terms and surrounding facts. *See Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1386 (Utah 1989).

In finding that APT was not an intended beneficiary, the Court applied an incorrect legal standard, holding that it could "interpret the contract as a matter of law, without considering the circumstances surrounding the contract's execution." (Appx52, n.4). Instead, Utah law requires courts to look to the "terms of the contract" *and* "the surrounding facts and circumstances." *Ron Case*, 773 P.2d at 1386. While

the Court claimed to consider surrounding facts and circumstances (Appx52, n.4), it improperly weighed them in Stoddard's favor.

Thus, the Court found that a statement from Stoddard that his "confidentiality obligation with APT is covered by McKinsey's general confidentiality agreement that I signed," (Appx7172), "does not indicate an intention that APT have enforceable rights under that contract" and "may simply suggest that Stoddard recognized that he breached his agreement with McKinsey and, consequently, could face consequences from McKinsey." (Appx52-53, n.4). But that weighed facts regarding intent in movant's favor. As this Court has recognized, intent is an "inherently factual" issue which must often be inferred from "surrounding circumstances" because "[d]irect evidence" is "rare." This makes it ill-suited for a motion to dismiss or summary judgment. *See Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1317 (Fed. Cir. 2006). Here, Stoddard's statement is "direct evidence" of an intent to protect APT. This Court should restore this claim.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of summary judgment for Defendants on APT's trade secret claims and remand for trial. It should reverse the dismissal of APT's contract claim and remand for further proceedings.

Dated:    July 19, 2024                FOLEY & LARDNER LLP

/s/ David B. Goroff
David B. Goroff
321 N. Clark Street, Suite 3000
Chicago, IL 60654-4762
Phone: 312.832.4500
dgoroff@foley.com

Pavan K. Agarwal
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC 20007-5101
Phone: 202.672.5300
pagarwal@foley.com

DENTONS US LLP

Kirk R. Ruthenberg
Nicholas H. Jackson
East Tower
1900 K Street, N.W.
Washington, DC 20006
Phone: 202.408.6410
kirk.ruthenberg@dentons.com

Spencer D. Hamilton
100 Crescent Court, Suite 900
Dallas, TX 75201
Phone: 214.259.0900
spencer.hamilton@dentons.com

*Attorneys for Plaintiff-Appellant Applied
Predictive Technologies, Inc.*

# ADDENDUM

# ADDENDUM OF STATUTES

## Utah Trade Secrets Act, § 13-24-2(2) – "Misappropriation" Definition

(2) "Misappropriation" means:

(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret; or

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.


## Utah Trade Secrets Act, § 13-24-2(4) – "Trade Secret" Definition

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**Defend Trade Secrets Act, 18 U.S.C. § 1839(3) – "Trade Secret" Definition**

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

 (A) the owner thereof has taken reasonable measures to keep such information secret; and

 (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

**Defend Trade Secrets Act, 18 U.S.C. § 1839(5) – "Misappropriation" Definition**

(5) the term "misappropriation" means—

 (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

 (B) disclosure or use of a trade secret of another without express or implied consent by a person who—

  (i) used improper means to acquire knowledge of the trade secret;

  (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

   (I) derived from or through a person who had used improper means to acquire the trade secret;

   (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

   (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

    (I) the trade secret was a trade secret; and

    (II) knowledge of the trade secret had been acquired by accident or mistake;

# ADDENDUM

# TABLE OF CONTENTS TO ADDENDUM

| Date Filed | Appx # | ECF/Exhibit Number | Document Description |
|---|---|---|---|
| 3/28/2024 | Appx1-39 | 647 | **SEALED DOCUMENT** Memorandum Decision & Order on Defendants' Motions for Summary Judgment |
| 3/28/2024 | Appx40 | 648 | JUDGMENT Signed by Judge Jill N. Parrish on 3/27/24. |
| 4/8/2022 | Appx41-78 | 315 | Memorandum Decision and Order Granting In Part and Denying in Part Defendants' Motion for Partial Dismissal (Unsealed Version) |
| 02/07/2023 | Appx79-92 | 420 | Memorandum Decision and Order Denying Defendants' Motion for Sanctions |

**APPX1-39 removed due to confidential material**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., | **JUDGMENT** |
| Plaintiff, | Case No. 2:19-cv-496-JNP-CMR |
| v. | District Judge Jill N. Parrish |
| MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS, | |
| Defendants. | |

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of Defendants MarketDial, Inc., John M. Stoddard, and Morgan Davis and against Plaintiff Applied Predictive Technologies, Inc.

DATED March 27, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge

Appx40

FILED
2022 APR 8 PM 3:53
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL DISMISSAL**<br><br>Case No. 2:19-cv-00496-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiff Applied Predictive Technologies, Inc. ("APT") sued Defendants MarketDial, Inc. ("MarketDial"), John M. Stoddard, and Morgan Davis (collectively, "Defendants") for various claims, including misappropriation of trade secrets, breach of contract, fraud, civil conspiracy, and tortious interference with contract. ECF Nos. 1, 188. Before the court is Defendants' Motion for Partial Dismissal of APT's Third Amended Complaint (ECF No. 195). Oral argument on the motion was held on March 10, 2022. For the reasons set forth herein, the court GRANTS IN PART and DENIES IN PART Defendants' motion. Specifically, the court dismisses APT's claims for breach of contract against Stoddard (count IV) and breach of contract against Davis (count V) WITH PREJUDICE. The court similarly dismisses APT's claims for fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI), civil conspiracy against Stoddard, Davis, and MarketDial (count VII), and tortious interference with contract against Davis and MarketDial (count VIII) WITHOUT PREJUDICE. The court declines to dismiss APT's claims for misappropriation of trade secrets against Davis (counts I and II).

1

## BACKGROUND[1]

Stoddard and Davis are the co-founders of MarketDial, a predictive business analytics company that competes directly with APT. Before founding MarketDial, Stoddard and Davis worked at McKinsey & Company, Inc. ("McKinsey") and Boston Consulting Group ("BCG"), respectively. While employed at McKinsey and BCG, Stoddard and Davis were required to comply with employee agreements, which governed the confidentiality of their firm's clients' information. Specifically, Stoddard's Employee Agreement with McKinsey contained the following provisions:

> Confidential Information includes information of the Firm, such as the Firm's frameworks, approaches and industry and other proprietary knowledge (including Properties), and information relating to personnel and compensation processes, structure and approaches. Confidential Information also includes information of the Firm's clients, such as clients' names, business plans and trade secrets. I agree, during my employment at the Firm and thereafter, to hold all such Confidential Information in strict confidence and not to disclose such information, in whole or in part . . . to persons outside the Firm, except as I am explicitly authorized to do so.
> . . .
> Should I leave the Firm, I will not take any actions that would give the appearance of disclosure. Therefore, I agree that, during my employment at the Firm and thereafter, I will not use or disclose any Confidential Information even if I happen to receive the same information from another source outside the Firm, and I will not act in any manner that might create the appearance that I am using Confidential Information in ways likely to damage the interests of the Firm or its clients.

ECF No. 196-1 at 1–2. Davis's Employee Agreement with BCG contained similar provisions, under which Davis agreed that he would "not identify any client of BCG to anyone outside BCG without the permission of that client or an officer of BCG" and would not, "[d]uring and after [his] employment by BCG, unless otherwise specifically approved by BCG, . . . use Confidential

---

[1] "The facts are recited from the complaint on a motion to dismiss, but the court makes no findings of facts as to such allegations." *See Spence v. Basic Rsch.*, No. 2:16-cv-925-CW, 2017 U.S. Dist. LEXIS 85175, at *2 n.1 (D. Utah May 31, 2017).

Information for the benefit of anyone other than BCG or a client of BCG to whom the Confidential Information relates." ECF No. 196-2 at 1–2.

On November 7, 2013, "[a] few months after Stoddard began at McKinsey," McKinsey and APT entered into a confidentiality agreement "under which APT provided access to its confidential information in connection with McKinsey's client development and client services, and for each party's consideration of potential transactions with other parties." ECF No. 210 at 8. The confidentiality agreement required McKinsey "(i) not to use (or allow any of its employees to use) any of [APT's] Confidential Information for any other purpose and (ii) to keep confidential and not disclose [APT's] Confidential Information other than to those of [McKinsey's] employees who have a need to know such information and who are bound by nondisclosure obligations consistent with the terms of [the confidentiality agreement]." *Id.* (emphasis omitted). Similarly, "[d]uring Davis's employment with BCG, BCG and APT entered into a Third Party Access Agreement dated January 26, 2012 regarding BCG's use of APT's proprietary software in the course of providing professional services to a mutual client." *Id.* at 10. The Third Party Access Agreement required BCG and its employees to "maintain the highest standards of confidentiality with regard to the Software" and prohibited disclosure to others, including "other BCG employees who are not providing the Services." *Id.* at 10–11 (emphasis omitted). The Access Agreement further required that "[n]o BCG representative provided access to the Software . . . be involved in developing a service which competes, directly or indirectly, with the Software." *Id.* at 11.

In spite of these confidentiality agreements, "[i]n January 2015, Stoddard and Davis began actively discussing their idea to launch a predictive business analytics company that would compete directly with APT." ECF No. 189 ¶ 5. In February 2015, Stoddard and Davis incorporated such a business, MarketDial. *Id.* Even though Stoddard was still employed by McKinsey and

bound by his Employee Agreement at this time, he "requested and received substantial APT confidential and trade secret information"—including PowerPoint presentations and case studies—"for at least a five-month period in 2015." *Id.* ¶ 101. Although Stoddard represented to APT that he was requesting the "information for the benefit of McKinsey's and APT's client development work," he was actually sending "the APT confidential and trade secret information he accessed" to Davis for MarketDial's use. *See id.* ¶¶ 101–02. In one email to Davis that contained APT's confidential information, Stoddard wrote, "You didn't get this from me." *Id.* ¶ 102.

In addition, "[d]espite knowing of Stoddard's confidentiality obligations [to APT], and despite Davis's own confidentiality obligations to APT," Davis and MarketDial "requested that Stoddard obtain APT confidential and trade secret information." *Id.* ¶ 140. Stoddard and Davis subsequently used APT's confidential information to develop the MarketDial system, which is similar to products and services offered by APT; "to develop [MarketDial's] business, technical[,] and marketing strategy"; and to compete with APT. *Id.* ¶ 141.

Based on the foregoing, on June 28, 2018, APT sued MarketDial and Stoddard for patent infringement and misappropriation of trade secrets. APT subsequently amended its complaint multiple times, filing its Third Amended Complaint ("TAC") on July 27, 2021. ECF No. 188. The TAC added Davis as a defendant in the case, as well as contract claims against Stoddard and Davis and various tort claims against all Defendants. Defendants moved for partial dismissal of the TAC under Federal Rule of Civil Procedure 12(b)(6). Specifically, Defendants moved to dismiss APT's claims for misappropriation of trade secrets against Davis (counts I and II); breach of contract against Stoddard (count IV); breach of contract against Davis (count V); fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI); civil conspiracy

against Stoddard, Davis, and MarketDial (count VII); and tortious interference with contract against Davis and MarketDial (count VIII).

## LEGAL STANDARD

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation omitted). Thus, when considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

A complaint survives a motion to dismiss for failure to state a claim when the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Indeed, the complaint must allege more than labels or legal conclusions and its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ANALYSIS

Defendants move to dismiss Counts IV through VIII of APT's TAC in their entirety. Defendants also move to dismiss Counts I and II as to Davis. The court addresses the parties'

arguments with respect to Counts IV through VIII first and then addresses their arguments regarding Counts I and II.

## I.    Count IV (Breach of Contract Against Stoddard)

Defendants move to dismiss APT's breach of contract claim against Stoddard.

### A.    Choice of Law Analysis

Based on the allegations in APT's TAC, it was unclear which state's law should be applied to APT's breach of contract claim against Stoddard. Accordingly, the court ordered the parties to brief the issue.[2] ECF No. 267. APT argues that Ohio law—rather than Utah law—should govern the claim because, as an initial matter, Ohio law and Utah law concerning intended third-party beneficiaries differ such that "the outcome [is] even clearer under Ohio law." ECF No. 274 at 3. Specifically, APT contends that while "it is well-established under Ohio case law that '[t]he third party need not be named in the contract, as long as he is contemplated by the parties to the contract and sufficiently identified,'" *id.* (quoting *Gallagher Sharp, L.L.P.  v. Miller Goler Faeges Lapine, L.L.P.*, 137 N.E.3d 647, 656 (Ohio Ct. App. 2019)) (emphasis omitted), "Utah courts have not expressly addressed this issue," *id.* Moreover, "while Utah courts require a 'separate and distinct benefit' running to the third party" for that party to be a third-party beneficiary to the contract, *id.* at 4 (citing *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 684 (Utah 2001)) (emphasis omitted), "Ohio courts have not expressed such a requirement," *id.*

Defendants respond that there is no conflict between Utah and Ohio law with respect to third-party beneficiaries and, therefore, Utah law governs APT's claim. Specifically, Defendants contend that, contrary to APT's assertions, "Utah courts have long held that a 'clear intent to

---

[2] The court similarly ordered the parties to brief the choice of law issue with respect to counts V–VIII.

benefit a third party, whether specifically named in the contract or not,' is sufficient to confer third-party beneficiary status." ECF No. 282 at 3 (quoting *M.H. Walker Realty Co. v. Am. Sur. Co. of N.Y.*, 211 P. 998, 1004 (Utah 1922)) (emphasis omitted). Defendants further assert that although Utah law requires the contracting parties to clearly intend "to confer a separate and distinct benefit upon the third party" for that third-party to have enforceable rights under the contract, *id.* (citation omitted), Ohio law has a similar requirement. In particular, for an individual to be a third-party beneficiary under Ohio law, "the performance of [the] promise must also satisfy a duty owed by the promisee to the beneficiary," which is the practical equivalent of Utah's "separate and distinct benefit" test. *Id.* at 4 (citation omitted). The court agrees with Defendants and analyzes APT's breach of contract claim against Stoddard under Utah law.

"[W]hen a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit," the federal court "'applies the substantive law, including choice of law rules, of the forum state.'" *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (citation omitted). Under Utah law, "a choice of law analysis is preceded by a determination of whether there is a true conflict between the laws of those states that are interested in the dispute." *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P.3d 1156, 1165 n.10 (Utah Ct. App. 2012). A true conflict exists if "the outcome would differ depending on which state's law is applied." *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1279 (D. Utah 2020) (citation omitted). When there is no conflict between the states' laws, a choice of law analysis is unnecessary, *see St. Paul Fire & Marine Ins. v. Com. Union Assurance*, 606 P.2d 1206, 1208 n.1 (Utah 1980), and the court "may apply the law of the forum," *Snyder v. Celsius Energy Co.*, 866 F. Supp. 1349, 1353 n.9 (D. Utah 1994).

Here, there is no true conflict between Utah and Ohio law regarding third-party beneficiaries. First, as Defendants note, neither Utah nor Ohio law requires that a third-party beneficiary be explicitly named in the contract. *See M. H. Walker*, 211 P. at 1004; *Chitlik v. Allstate Ins. Co.*, 299 N.E.2d 295, 297 (Ohio Ct. App. 1973) ("The third party need not be named in the contract, as long as he is contemplated by the parties to the contract and sufficiently identified."). Similarly, the court agrees with Defendants that Utah's "separate and distinct benefit" test is not materially different from Ohio's third-party beneficiary test. Specifically, under Ohio law, one is a third-party beneficiary of a contract "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either[:] (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Hill v. Sonitrol of Sw. Ohio*, 521 N.E.2d 780, 784 (Ohio 1988) (internal quotation marks and citation omitted). In other words, "[a] third-party beneficiary is defined as one for whose benefit a promise has been made in a contract but who is not a party to the contract." *Drew v. Weather Stop Roofing Co., LLC*, 154 N.E.3d 136, 140 (Ohio Ct. App. 2020) (citation omitted). Accordingly, similar to Utah law, Ohio law requires the contracting parties to intend to confer a distinct benefit on the third-party in order for that party to be a third-party beneficiary with enforceable rights under the contract. Because the court cannot discern a true conflict between Utah and Ohio law regarding third-party beneficiary status, the court analyzes APT's breach of contract claim against Stoddard under Utah law. *See Snyder*, 866 F. Supp. at 1353 n.9.

B.      *Substantive Analysis*

Defendants argue that APT's breach of contract claim against Stoddard fails as a matter of law because APT was neither a party nor an intended third-party beneficiary of the contract that

Stoddard allegedly breached, his Employee Agreement with McKinsey. Specifically, Defendants contend that even though Stoddard's Employee Agreement required Stoddard to maintain the confidentiality of McKinsey's clients' information—including that of APT—the parties were not intending to confer a separate and distinct benefit on McKinsey's clients. Rather, according to Defendants, McKinsey's motives were primarily selfish. *See* ECF No. 214 at 2 n.1 ("[B]y ensuring the protection of client information, [McKinsey] ensures its ability to attract clients, maintain trust, and accordingly profit. Accordingly, the benefit is intended for [McKinsey]," not APT).

Defendants further contend that APT's argument that the surrounding circumstances support APT's status as a third-party beneficiary to the Stoddard-McKinsey contract misses the mark. In particular, Defendants assert that, rather than focusing on the contract that is actually at issue, APT focuses on its contract with McKinsey, which "sheds no light on the intentions of Stoddard and McKinsey with respect to the Stoddard-McKinsey Agreement," which was executed three months before APT and McKinsey entered into their contract. *See id.* at 3–4.

APT responds that "the express language of the contracts, combined with the surrounding circumstances, makes clear that APT—as a client of . . . McKinsey . . . —is an intended third-party beneficiary of" Stoddard's Employee Agreement with McKinsey. ECF No. 210 at 4. Specifically, APT contends that Stoddard's contract with McKinsey "impose[d] strict confidentiality obligations that r[a]n not only to [McKinsey], but *separately and distinctly* to [McKinsey's] '*clients*,'" such as APT. *Id.* at 5. "Indeed," according to APT, "requiring Stoddard to safeguard client information directly benefits clients like APT beyond benefits to McKinsey." *Id.* at 6. APT further asserts that "the surrounding circumstances corroborate the language and intent of the agreement[], providing further evidence that the parties intended to confer separate and distinct benefits to APT." *Id.* at 8. In particular, APT argues that the confidentiality agreement that it entered

9

with McKinsey, which "cover[ed] the exact kind of client confidential information contemplated by Stoddard's Employee Agreement, . . . further solidifies that APT was an intended beneficiary of McKinsey's Employee Agreement with Stoddard," *id.*, as does the fact that Stoddard recognized that his confidentiality obligations to APT were covered by that agreement. The court disagrees.

"One of the most basic principles of contract law is that, as a general rule, only parties to the contract may enforce the rights and obligations created by the contract." *Wagner v. Clifton*, 62 P.3d 440, 442 (Utah 2002). However, one exception is for third-party beneficiaries. *See id.* Under Utah law, to be a third-party beneficiary with enforceable rights under the contract, "[t]he written contract must show that the contracting parties 'clearly intended to confer a separate and distinct benefit upon the third party.'" *Id.* (citation omitted). "'[I]t is not enough that the parties to the contract know, expect or even intend that others will benefit from the [contract] . . . . The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." *Brodkin v. Tuhaye Golf, LLC*, 355 P.3d 224, 230 (Utah Ct. App. 2015) (quoting *SME Indus.*, 28 P.3d at 684) (alterations in original). Indeed, "only if the written contract's clear intent is to confer rights upon a third party may that third party enforce rights and obligations of the contract," *Wagner*, 62 P.3d at 442; "a party only incidentally benefitted has no right to recover under the contract," *SME Indus.*, 28 P.3d at 684. Moreover, "[u]nder Utah law, [t]he existence of third party beneficiary status is determined by examining [the] written contract. [I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Fornazor Int'l, Inc. v. Huntsman*, No. 2:14-CV-291 TS, 2015 U.S. Dist. LEXIS 142314, at *21–22 (D. Utah Oct. 19, 2015) (internal quotation marks and citations omitted).

10

**Appx50**

Here, APT has failed to establish that it was a third-party beneficiary of Stoddard's Employee Agreement with McKinsey. Specifically, although the contract[3] explicitly required Stoddard to protect clients' confidential information in addition to McKinsey's confidential information, it is not clear that these contract provisions were undertaken for McKinsey's clients' direct benefit or that they were intended to confer enforceable rights on McKinsey's clients. As Defendants point out, it is likely that these provisions were included in the Employee Agreement for *McKinsey's* benefit. In particular, such confidentiality obligations among its employees likely helps McKinsey recruit clients, instill their trust, and maintain their business. A potential client would likely be hesitant to solicit McKinsey's services if it knew that McKinsey's employees were free to share the client's trade secrets with the world. Moreover, if McKinsey were ever sued by a client for disclosing the client's trade secrets, such provisions would likely be helpful if McKinsey decided to sue, in turn, the employee who disclosed the trade secrets. Thus, although Stoddard and McKinsey may have known, expected, or even intended that McKinsey's clients would benefit from Stoddard's Employee Agreement, the contract does not affirmatively make it clear that the confidentiality provisions were undertaken for McKinsey's clients' direct benefit. In fact, the provision prohibiting McKinsey employees from "tak[ing] any actions that would give the appearance of disclosure" of a client's confidential information further suggests that the provisions were included primarily for McKinsey's benefit. *See* ECF No. 210 at 6. It is unlikely that a client

---

[3] Defendants attached Stoddard's Employee Agreement with McKinsey to their motion for partial dismissal. Because Stoddard's Employee Agreement is referred to in APT's TAC, is central to APT's breach of contract claim, and is indisputably authentic, the court may consider the contract without converting Defendants' motion to dismiss to a motion for summary judgment. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

has much interest in whether it appears that a McKinsey employee disclosed the client's confidential information; the client is likely primarily interested in whether its confidential information *has* been disclosed or not. McKinsey, on the other hand, has a strong interest in preventing the appearance of disclosure, since such appearance could damage McKinsey's relationships with its clients or prospective clients and could expose McKinsey to potential lawsuits. In short, the primary intention of this provision, as well as the other provisions protecting the confidentiality of clients' information, is intended to protect McKinsey's interests. As a result, APT has failed to establish that it was a third-party beneficiary of Stoddard's Employee Agreement. Accordingly, because APT was not a party to the contract, APT has no right to recover under the contract and its breach of contract claim must be dismissed.[4]

---

[4] Because "the language within the four corners" of Stoddard's Employee Agreement is unambiguous, the court may determine the parties' intentions regarding third-party beneficiary status "from the plain meaning of the contractual language" and may interpret the contract as a matter of law, without considering the circumstances surrounding the contract's execution. *See Fornazor Int'l*, 2015 U.S. Dist. LEXIS 142314, at *21–22 (citation omitted). That said, the court also notes that the surrounding circumstances to which APT points do not clearly indicate that Stoddard's Employee Agreement was undertaken for APT's direct benefit. Specifically, the terms of McKinsey's Cooperation and Confidentiality Agreement with APT, which was entered into three months after Stoddard's Employee Agreement was executed, shed limited light on Stoddard's and McKinsey's intentions when they executed the Employee Agreement. And, contrary to APT's assertion, the fact that APT's agreement with McKinsey "cover[ed] the exact kind of client confidential information contemplated by Stoddard's Employee Agreement" and "explicitly include[d] McKinsey employees like Stoddard within its scope" actually undercuts APT's contention that it was a third-party beneficiary to Stoddard's Employee Agreement. *See* ECF No. 210 at 8. If APT was a third-party beneficiary to Stoddard's Employee Agreement, there would have been no need to include redundant, duplicative provisions in the APT-McKinsey agreement.

In addition, the fact that the APT-McKinsey agreement required *McKinsey* to prevent its employees from the unauthorized use of APT's confidential information further suggests that the confidentiality provisions in Stoddard's Employee Agreement were primarily undertaken for McKinsey's benefit. In particular, the confidentiality provisions were likely a means by which McKinsey could attempt to prevent such misuse, thereby protecting itself from the legal exposure that would result from an employee's apparent or actual misuse of APT's information.

Furthermore, the fact that Stoddard recognized—correctly—that he was obligated to protect APT's confidential information under his Employee Agreement with McKinsey does not indicate an intention that APT have enforceable rights under that contract. Rather, it may simply

## II.    Count V (Breach of Contract Against Davis)

Defendants move to dismiss APT's breach of contract claim against Davis.

### A.    *Choice of Law Analysis*

Both parties agree that Massachusetts law applies to APT's breach of contract claim against Davis. The Boston Consulting Group, Inc. Employee Agreement ("BCG Employee Agreement") under which APT is suing Davis contains a governing law provision, which provides that "[t]his agreement shall be governed, interpreted and enforced in accordance with the laws of Massachusetts." *See* ECF 196-2 § 4(c). Because Utah courts "generally uphold choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract," *GRB Enters. LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11-cv-833-DAK, 2012 WL 845418, at *3 (D. Utah Mar. 12, 2012), the court concludes that Massachusetts law governs APT's breach of contract claim against Davis.

### B.    *Substantive Analysis*

Similar to their arguments with respect to APT's breach of contract claim against Stoddard, Defendants argue that APT's breach of contract claim against Davis fails as a matter of law because APT was neither a party to, nor a third-party beneficiary of, Davis's BCG Employee Agreement.[5] Specifically, Defendants contend that Davis and BCG "did not clearly express an intention to confer any separate and distinct benefit on APT." *See* ECF No. 196 at 10. Defendants further note that while § 4(a) of the BCG Employee Agreement "specifically names BCG's subsidiaries as

_____

suggest that Stoddard recognized that he breached his agreement with McKinsey and, consequently, could face consequences from McKinsey.

[5] Defendants attached the BCG Employee Agreement to their motion for partial dismissal. Because the BCG Employee Agreement is referred to in APT's TAC, is central to APT's breach of contract claim against Davis, and is indisputably authentic, the court may consider the contract without converting Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) to a motion for summary judgment. *See GFF Corp.*, 130 F.3d at 1384.

beneficiaries with rights to enforce the agreement," there is no mention that APT—or any other BCG clients—have the right to enforce the agreement. *See id.* at 10 n.7. Moreover, Defendants contend that APT's discussion of the "surrounding circumstances" is misguided because APT focuses on its agreement with BCG, which "sheds no light on the intentions of Davis and BCG with respect to the Davis-BCG Agreement." *See* ECF No. 214 at 4.

APT responds in much the same way that it did regarding its breach of contract claim against Stoddard—that Davis's BCG Employee Agreement "impose[d] strict confidentiality obligations that r[a]n not only to [BCG], but *separately and distinctly* to [BCG's] '*clients.*'" ECF No. 210 at 5. APT points to provisions in the BCG Employee Agreement that required Davis to protect BCG's clients' information and that distinguished clients' confidential information from BCG's confidential information. APT further contends that the surrounding circumstances, including the terms of the Third Party Access Agreement that BCG and APT entered, support the conclusion that APT was a third-party beneficiary of Davis's BCG Employee Agreement. The court disagrees.

Under Massachusetts law, "[a] plaintiff may sue for breach of a contract to which she is not a party where she is a third-party beneficiary of that contract." *Orell v. UMass Mem. Med. Ctr.*, 203 F. Supp. 2d 52, 67 (D. Mass. 2002).

> A third party is an intended beneficiary of a contract if: "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties to the contract and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Id.* at 67–68 (quoting *Flattery v. Gregory*, 489 N.E.2d 1257, 1261 (Mass. 1986)). "Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, . . . a person aspiring to such status must show with special

clarity that the contracting parties intended to confer a benefit on him." *Kelly v. Deutsche Bank Nat'l Tr. Co.*, 789 F. Supp. 2d 262, 267 (D. Mass. 2011) (quoting *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994)) (alteration in original); *see also Rymes Heating Oils, Inc. v. Springfield Terminal Ry., Inc.*, 265 F. Supp. 2d 147, 151 (D. Mass. 2003) ("To determine whether an entity is an intended beneficiary, courts 'look at the language and circumstances of the contract for indicia of intention' and the 'intent must be clear and definite.'" (citation omitted)). Moreover, "[u]nder Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous." *Lisciotti v. Lattanzio*, No. 04-2155, 2006 Mass. Super. LEXIS 450, at *13 (Sept. 14, 2006).

Here, APT has failed to establish that it was a third-party beneficiary of Davis's BCG Employee Agreement. In particular, APT has failed to "show with special clarity that" Davis and BCG intended to confer a benefit on APT, *see Kelly*, 789 F. Supp. 2d at 267 (citation omitted), or that "recognition of a right to performance in [APT] is appropriate to effectuate the intention[s]" of Davis and BCG, *see Orell*, 203 F. Supp. 2d at 67–68 (citation omitted). Although it is true that the BCG Employee Agreement required Davis to protect BCG's clients' confidential information, it is not clear that such confidentiality provisions were intended to confer a benefit on BCG's clients, as opposed to BCG itself. Indeed, like the Stoddard-McKinsey agreement, the primary intention behind the confidentiality provisions in the BCG Employee Agreement may have been to further and protect BCG's interests by facilitating client recruitment and retention and mitigating potential legal exposure.

Indeed, one of the contract provisions to which APT points actually further supports the conclusion that the confidentiality requirements were primarily intended to benefit BCG, rather than BCG's clients. That contract provision provides: "During and after my employment by BCG,

15

**Appx55**

*unless otherwise specifically approved by BCG*, I will not: . . . use Confidential Information for the benefit of anyone other than BCG or a client of BCG to whom the Confidential Information relates." ECF No. 210 at 6 (emphasis added). Pursuant to this provision, BCG—and not the client—has the power to authorize a BCG employee to use or disclose a client's confidential information. Therefore, if disclosure or use of a client's confidential information benefits *BCG*, BCG may authorize an employee to disclose or use such information, even if such actions are contrary to the client's interests. Thus, this provision indicates that the contract is truly intended to benefit BCG and further its interests, rather than its clients' interests. To the extent that clients, such as APT, benefit from the confidentiality provisions, the benefits appear to be merely incidental. *See McLarnon v. Mass. Gen. Hosp.*, No. 00-2910-C, 2001 Mass. Super. LEXIS 570, at *7–8 (Oct. 9, 2001) ("The rights of a third-party beneficiary to enforce a contract arises 'when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third.' Thus, enforcement rights do not extend to anyone or everyone potentially benefitted by the contracting parties' agreement, but only to those who can demonstrate from the language and circumstances of the contract that the parties clearly and definitely intended the beneficiaries to benefit from the promised performance." (internal citation omitted)).

Moreover, another contract provision also supports the conclusion that the parties did not intend to grant enforceable rights to APT. As Defendants note, the BCG Employee Agreement explicitly grants the right to enforce the Agreement to BCG and its subsidiaries. *See* ECF No. 196-2 § 4(a) ("BCG and any Subsidiary shall have the right to enforce this agreement."). The fact that BCG's clients, such as APT, were not similarly granted such explicit enforcement rights in the contract further supports the conclusion that the parties did not intend for them to have the right to enforce the BCG Employee Agreement. *See Smart v. Gillette Co. Long-Term Disability Plan*, 70

F.3d 173, 179 (1st Cir. 1995) ("The maxim [*expressio unius est exclusio alterius*] instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded. While this interpretive maxim is not always dispositive, it carries weight." (internal citation omitted)). Thus, the court concludes that APT was not a third-party beneficiary of Davis's BCG Employee Agreement.[6] Because APT was not a direct party to that contract, APT has no right to recover under that contract and its breach of contract claim against Davis must be dismissed.[7]

## III.   Count VI (Fraudulent Misrepresentation and Fraudulent Nondisclosure Against Stoddard)

Defendants move to dismiss APT's fraudulent misrepresentation and fraudulent nondisclosure claim against Stoddard.

### A.   Choice of Law Analysis

APT argues that its fraud claim should be analyzed under Ohio law. Specifically, APT contends that there is a conflict between Utah and Ohio law with respect to fraud claims for monetary damages. Whereas Utah law requires a plaintiff to prove the elements of fraud by clear

---

[6] Because Davis's BCG Employee Agreement is unambiguous, the court determines that APT was not a third-party beneficiary to that contract as a matter of law, and it need not examine the circumstances surrounding that contract's execution. *See Baystate Fin. Servs., LLC v. Pinto*, No. 2084CV02507, 2021 Mass. Super. LEXIS 29, at *8 (Feb. 18, 2021) ("[P]roper interpretation of [an] unambiguous written contract is [a] question of law that may be resolved on [a] motion to dismiss for failure to state a claim." (citation omitted)). That said, the surrounding circumstances to which APT points do not clearly and definitely indicate that APT was a third-party beneficiary to Davis's BCG Employee Agreement. Specifically, the terms of the Third Party Access Agreement that APT and BCG entered shed limited—if any—light on Davis's and BCG's intentions when they executed Davis's BCG Employee Agreement. In addition, the fact that the Third Party Access Agreement contained terms that overlapped with the confidentiality provisions in the BCG Employee Agreement actually supports the conclusion that APT's interests were not protected by that contract and, therefore, APT pursued such protection in the Access Agreement.

[7] Defendants also argue that APT's breach of contract claim against Davis should be dismissed because it was brought in the wrong venue. Because the court dismisses the claim for the reasons described above, the court need not—and does not—address the parties' arguments regarding venue.

and convincing evidence, "under Ohio law, when a plaintiff seeks monetary damages on its fraud claim—as APT does here—the plaintiff is required to prove the claim only by the preponderance of the evidence." ECF No. 274 at 8 (citing Utah and Ohio cases supporting these propositions). APT further contends that, as a result, the court must determine whether Utah or Ohio has the most significant relationship to the fraud claim, and that Ohio has the most significant relationship. Thus, according to APT, the court should apply Ohio law to its fraud claim.

In response, Defendants argue that Utah law should govern APT's fraud claim against Stoddard. Defendants contend that, "[a]ssuming a conflict exists," Utah has the most significant relationship to the fraud claim. ECF No. 282 at 9. The court disagrees.

As an initial matter, the court agrees with APT that there is a conflict between Utah and Ohio law regarding the burden of proof required to establish a fraud claim for monetary damages. Utah law requires a plaintiff to establish each element of fraud by clear and convincing evidence. *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986) ("[I]n order to prevail on a claim of fraud, all the elements of fraud must be established by clear and convincing evidence."). In contrast, Ohio law requires a plaintiff seeking monetary damages to establish each element of fraud by only the preponderance of the evidence. *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 866 (Ohio Ct. App. 2021) ("[A] party seeking a monetary remedy must prove fraud by the preponderance of the evidence." (citation omitted)). Because the outcome of APT's fraud claim could depend on whether Utah or Ohio law is applied, a true conflict between the states' laws exists, and the court must conduct a conflict of law analysis. *See Johnson*, 500 F. Supp. 3d at 1279.

To determine "which state's laws should apply to a given circumstance" when there is a true conflict of laws, Utah courts "apply the 'most significant relationship' approach as described

in the Restatement (Second) of Conflict of Laws." *Soundvision Techs., LLC v. Templeton Grp. Ltd.*, 929 F. Supp. 2d 1174, 1192 (D. Utah 2013) (internal citation omitted).

> Utah courts consider the following factors when determining which state has the most significant relationship to a tort dispute: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

*Id.* (citation omitted). "Further, 'these contacts are to be evaluated according to their relative importance with respect to the particular issue.'" *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1060 (Utah 2002) (quoting Restatement (Second) Conflict of Laws § 145(2) (1971)). Whereas "the place of injury is less significant in the case of fraudulent misrepresentations," *Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *12 (D. Utah Nov. 30, 2007) (citation and emphasis omitted), "the place of the alleged conduct carries more weight," *id.*

Here, the factors weigh in favor of Ohio. Specifically, the conduct at issue—that is, the conduct that caused APT's alleged injuries—is Stoddard's alleged misrepresentations and nondisclosures. According to APT, "Stoddard was living in Ohio in 2015 when he made the misrepresentations and nondisclosures to Kevin Keane of APT that gave rise to this claim." ECF No. 274 at 10. Moreover, "[t]he emails Stoddard sent to APT that form the basis of [the fraud] claim—emails in which he misrepresented that he was seeking APT information for use with McKinsey and would limit its use to McKinsey—were sent when he was working in Ohio." *Id.* Thus, although, as Defendants contend,[8] the information that Stoddard allegedly fraudulently obtained may have subsequently been transmitted to Utah, received in Utah, and misused in Utah,

---

[8] The court notes that Defendants' contentions are not an admission of wrongdoing, but are simply arguments based on the allegations in APT's TAC.

the allegedly fraudulent conduct that caused and set in motion APT's alleged injuries occurred in Ohio. Moreover, at the time of the allegedly fraudulent conduct, Stoddard was domiciled in Ohio and APT's principal place of business was in Virginia, where APT's alleged injuries may have been experienced most strongly. The court concludes that Ohio—and not Utah—has the most significant relationship to APT's fraud claim against Stoddard. Therefore, it will apply Ohio law to the claim. *See Soundvision Techs.*, 929 F. Supp. 2d at 1192.

      *B.*    *Substantive Analysis*

Defendants argue that APT's fraud claim against Stoddard is preempted by the Utah Uniform Trade Secrets Act ("UUTSA"). Specifically, Defendants contend that the UUTSA preempts a claim if "the claim fails without allegations regarding misuse of information," ECF No. 196 at 13 (quoting *Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, No. 2:20-cv-00062-JNP-JCB, 2021 U.S. Dist. LEXIS 63002, at *19 (D. Utah Mar. 30, 2021)), and that "[i]f allegations regarding the acquisition and misuse of APT's information are removed from Count VI, there is nothing left of this claim," *id.* at 14. In particular, Defendants contend that "the claimed injuries APT alleges resulted from the purported fraud overlap entirely with the claimed injuries APT alleges resulted from Defendants' purported misappropriation." ECF No. 214 at 8. Defendants further contend that "[i]f the allegations of injury alleged to arise from Stoddard's purported fraud are removed, APT has no action for fraudulent misrepresentation or nondisclosure." *Id.* Defendants also assert that, because the fraud claim is inextricably intertwined with allegations regarding the misuse of confidential information, the claim is preempted regardless of which state's law is applied to the claim.

APT responds that the UUTSA does not preempt its fraud claim against Stoddard.[9] APT argues that the allegations in the TAC "make clear that Stoddard's fraudulent misrepresentations and nondisclosures are based on wrongful conduct separate and apart from his *misappropriation* of trade secrets." ECF No. 210 at 14. In particular, APT contends that "Stoddard's fraudulent conduct went well beyond misappropriation. He made fraudulent misrepresentations and nondisclosures by holding himself out as trying to help McKinsey consult for APT, when in reality he was directly developing a business to compete with APT." *Id.* APT further contends that its "fraud claim against Stoddard is not preempted by the UUTSA because the claim is not being asserted under Utah law." *Id.* at 15.

The UUTSA preemption provision provides that the UUTSA "displaces conflicting tort, restitutionary, and other law *of this state* providing civil remedies for misappropriation of a trade secret." Utah Code § 13-24-8(1) (emphasis added). Because APT's fraud claim is brought under Ohio law, the court agrees with APT that the *Utah* Uniform Trade Secrets Act does not preempt APT's claim since the UUTSA's preemption provision applies only to claims brought under Utah law. *See Aortech Int'l PLC v. Maguire*, No. 2:14-cv-00171-RJS-EJF, 2016 U.S. Dist. LEXIS 147079, at *16–17 (D. Utah Oct. 21, 2016) (noting that the UUTSA "does not preempt claims arising under laws of other forums").

---

[9] APT also argues that "[b]ecause Defendants are challenging whether the confidential information meets the UUTSA's definition of trade secret and comes within the purview of the UUTSA, Defendants cannot invoke the statute's preemption provision at this stage of the case." ECF No. 210 at 13. APT relies on *ClearOne Communications, Inc. v. Chiang*, No. 2:07-cv-37 TC, 2007 U.S. Dist. LEXIS 91693 (D. Utah Dec. 13, 2007), to support this proposition. However, five years later, the Utah Court of Appeals soundly rejected the approach taken by the *ClearOne* court, describing it as the minority view and adopting the majority view that the UUTSA "preempts claims based on the unauthorized use of information, irrespective of whether that information meets the statutory definition of a trade secret." *CDC Restoration & Constr., LC v. Tradesmen Contrs., LLC*, 274 P.3d 317, 329–30 (Utah Ct. App. 2012). Therefore, the court rejects APT's argument that it is premature to resolve Defendants' preemption argument.

That said, the court concludes that the *Ohio* Uniform Trade Secrets Act ("OUTSA") preempts APT's fraud claim against Stoddard. The OUTSA contains the same preemption provision as the UUTSA. *See* OHIO REVISED CODE § 1333.67(A) ("[S]ections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."). And Ohio courts have adopted the majority interpretation of the preemption provision, under which "common-law claims are preempted only to the extent that they are based on misappropriation-of-trade-secrets facts." *Off. Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912, 919 (N.D. Ohio 2011) (noting that "[i]ntermediate appellate courts in the State of Ohio have applied the majority view"). Thus, under Ohio law, "a non-[O]UTSA claim survives only if [the] plaintiff alleges factual matter beyond [the] misappropriation-of-trade-secrets or other information."[10] *Id.*

Here, APT's fraud claim fails without allegations regarding Stoddard's misuse of APT's confidential information. Under Ohio law,

> [t]he elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with intent to mislead another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

---

[10] At oral argument, APT presented the argument that the preemption provision of the OUTSA is operative only if the plaintiff brings a claim under the OUTSA. The court rejects this argument. Specifically, the preemption provision of the OUTSA explicitly provides that the OUTSA "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." OHIO REVISED CODE § 1333.67(A). There is nothing in the statutory language that suggests that such displacement is contingent on the plaintiff first presenting a claim under the OUTSA. This plain meaning interpretation of the preemption provision of the Uniform Trade Secrets Act has been adopted by federal courts. *See PC Connection, Inc. v. Price*, No. 15-cv-208-PB, 2015 WL 6554546, at *6–8 (D.N.H. Oct. 29, 2015) (holding that plaintiff's conversion and breach of fiduciary duties claims were preempted, at least in part, by the New Hampshire Uniform Trade Secrets Act ("NHUTSA"), even though the plaintiff did not present a claim under the NHUTSA).

*Levy v. Seiber*, 57 N.E.3d 331, 338 (Ohio Ct. App. 2016). As Defendants note, when the allegations regarding Stoddard's misuse of APT's confidential information are removed from the TAC, APT fails to allege that it was injured by Stoddard's allegedly fraudulent conduct. Specifically, all of APT's alleged injuries stem from Stoddard's alleged misuse of APT's information. *See, e.g.*, ECF No. 189 ¶ 128 ("APT has been damaged as detailed throughout this Third Amended Complaint, and specifically *by disclosing its confidential information to Stoddard, who in turn disclosed such information to Davis and MarketDial to be used improperly to build a business to directly compete with APT using APT's protected confidential and trade secret information*. Stoddard's actions have caused and will cause significant and irreparable financial harm to APT, including loss of customers and other business relationships and its legitimate competitive advantage that APT has earned through its substantial investments *in its confidential information and trade secrets*." (emphasis added)). Because "a resulting injury" is an essential element of a fraud claim under Ohio law, *Levy*, 57 N.E.3d at 338, and APT fails to allege any injury that is independent of Stoddard's alleged misuse of APT's information, APT's fraud claim is preempted by the OUTSA.[11] *See Off. Depot*, 821 F. Supp. 2d at 919. Therefore, APT's fraud claim against Stoddard must be dismissed.[12] *See* OHIO REVISED CODE § 1333.67(A).

---

[11] At oral argument, APT attempted to articulate a theory of injury that is independent of Defendants' alleged misappropriation of APT's confidential information. Specifically, APT stated that, as a result of Stoddard's allegedly fraudulent conduct, APT was deprived of the full benefit of its relationship with McKinsey and that such an injury is independent of Defendants' alleged misuse of APT's information. Even if the court assumes that such an injury is independent of Defendants' alleged misappropriation of APT's confidential information, a fair reading of APT's TAC reveals that APT did not allege such an injury, and APT certainly did not mention that alleged injury in its prayer for damages, as demonstrated in the main text above. *See* ECF No. 189 ¶ 128. Therefore, APT may not rely on this newly asserted theory of injury for this claim or for APT's other tort claims (i.e., civil conspiracy and tortious interference with contract).

[12] In its opposition to Defendants' motion for partial dismissal, APT asked in passing for the opportunity to amend its complaint if the court concluded that any of its tort claims were preempted by either the UUTSA or OUTSA. The court notes that under the local rules, a party must move for

23

IV.    **Count VII (Civil Conspiracy Against Stoddard, Davis, and MarketDial)**

Defendants move to dismiss APT's civil conspiracy claim against Stoddard, Davis, and MarketDial.

*A. Choice of Law Analysis*

APT argues that the court should apply Ohio law, rather than Utah law, to its civil conspiracy claim. As a preliminary matter, APT contends that there is a true conflict between Ohio and Utah law because "a meeting of the minds" is an express element of civil conspiracy under Utah law, whereas, according to APT, Ohio law

> does not require proof of a meeting of the minds as a specific element of civil conspiracy. Instead, Ohio courts hold that a formal agreement between defendants is not required, but rather "only a common understanding or design, even if tacit, to commit an unlawful act." In short, Ohio courts simply do not require an express agreement as part of a civil conspiracy.

ECF No. 274 at 11 (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)) (internal citation omitted).

Defendants respond, in part, that "Ohio law requires proof of 'a malicious combination to injure,' which is equivalent to Utah's requirement of a 'meeting of the minds.'" ECF No. 282 at 11–12 (internal citation omitted). Moreover, Defendants assert that, contrary to APT's contention, a formal agreement among conspirators is not required under Utah law. Thus, according to Defendants, there is no conflict between Utah and Ohio law and, therefore, the court should apply Utah law to APT's civil conspiracy claim. The court agrees.

As Defendants suggest, there is no true conflict between Utah and Ohio law with respect to civil conspiracy. Although Utah law requires the plaintiff to establish that there was "a meeting

---

leave to amend a pleading, *see* DUCivR 15-1, and that "[a] party may not make a motion . . . in a response," DUCivR 7-1(a)(3). Therefore, APT's attempt to move for leave to amend its complaint was not valid under the local rules.

of the minds on the object or course of action" of the conspiracy, *Lawrence v. Intermountain, Inc.*, 243 P.3d 508, 513 (Utah Ct. App. 2010), the plaintiff need not "prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence. Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators," *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987) (internal citation omitted). Moreover, under Utah law, mere "knowing and intentional participation" in the conspiracy is sufficient to establish a meeting of the minds. *See Lawrence*, 243 P.3d at 513. Thus, Utah's "meeting of the minds" element is the practical equivalent of Ohio's "malicious combination to injure" element, which "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *See Gosden*, 687 N.E.2d at 496. Because it does not appear that the outcome of APT's civil conspiracy claim "would differ depending on which state's law is applied," there is no true conflict between Ohio and Utah law, *see Johnson*, 500 F. Supp. 3d at 1279 (citation omitted), and the court may apply Utah law, *see Snyder*, 866 F. Supp. at 1353 n.9. Therefore, the court applies Utah law to APT's civil conspiracy claim against Stoddard, Davis, and MarketDial.

B.      *Substantive Analysis*

Defendants argue that APT's civil conspiracy claim must be dismissed because it is preempted by the UUTSA. Specifically, Defendants assert that "there is nothing left" of the civil conspiracy claim when "the allegations regarding acquisition and misuse of APT's information are removed." ECF No. 196 at 14–15.[13]

---

[13] Defendants also assert that APT's conspiracy claim is barred by the intracorporate conspiracy doctrine. Because the court dismisses APT's conspiracy claim on the basis of preemption, the court

APT responds that its "civil conspiracy claim is not preempted because it stands independent from the misappropriation allegations." ECF No. 210 at 17. According to APT, "Davis and MarketDial encouraged, requested, and induced Stoddard to fraudulently misrepresent his purpose and intentions with respect to APT and fraudulently fail to disclose that he was using such information to co-found a business to directly compete with APT, which was a direct breach of Stoddard's Employee Agreement. Defendants subsequently built a competing platform in order to compete with, steal customers from, and 'take down' APT. This conduct is separate and apart from misappropriation that gives rise to APT's UUTSA claim—the claim does not fail without misappropriation."[14] *Id.* at 17 (internal citations omitted). The court disagrees.

As stated previously, the UUTSA contains a preemption provision providing that the UUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." UTAH CODE § 13-24-8(1). In interpreting the scope of the UUTSA's preemption provision, the Utah Court of Appeals held that "a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information." *CDC Restoration*, 274 P.3d at 331. Accordingly, "if proof of a non-[U]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective o[f] whatever surplus elements of proof were necessary to establish it." *Id.* (citation omitted). "Stated differently, if the [non-UUTSA] claim fails without the allegations regarding misuse of information, the [U]UTSA preempts it." *Giles Constr., LLC v. Tooele Inventory Sol., Inc.*, No. 2:12-cv-37, 2015 WL 3755863,

---

need not—and does not—address the parties' arguments regarding the intracorporate conspiracy doctrine.

[14] APT also contends that its civil conspiracy claim is not preempted by the UUTSA because the claim is governed by Ohio law. As discussed above, the court concludes that APT's civil conspiracy claim is actually governed by Utah law.

at *6 (D. Utah June 16, 2015). "However, to whatever extent that a claim is 'based upon wrongful conduct independent of the misappropriation of trade secrets' or otherwise confidential information, it is not preempted." *CDC Restoration*, 274 P.3d at 331 (citation omitted).

Here, APT's civil conspiracy claim fails without the allegations regarding misuse of information. As an initial matter, according to the allegations in the TAC, the entire object of the alleged conspiracy was to misappropriate APT's confidential information. *See* ECF No. 189 ¶ 131 ("Defendants knowingly and willfully conspired and agreed among themselves to fraudulently and tortiously gain access to and acquire valuable *APT confidential and proprietary information and data* to develop MarketDial, its business strategy, its software and software development strategy, and its client development strategy and list of target clients; enter into the A/B testing and business analytics market at very little to no cost, and compete against and 'take down' APT." (emphasis added)).

Moreover, under Utah law, an essential element for a civil conspiracy claim is "one or more unlawful, overt acts." *Israel Pagan*, 746 P.2d at 790. According to the TAC, APT alleges that the unlawful, overt acts committed by Defendants were fraud and tortious interference. *See* ECF No. 189 ¶ 131 ("[Defendants] conspired to wrongfully, *through fraud and tortious interference*, obtain APT's confidential information to form a directly competing business and 'take APT down.'" (emphasis added)). However, as discussed above with respect to fraud and below with respect to tortious interference, these allegedly unlawful acts are not independent of Defendants' alleged misappropriation of APT's information. Similarly, to the extent that the unlawful act or acts is Stoddard's alleged breach of his Employee Agreement with McKinsey, the alleged breach was his misuse of APT's confidential information. Thus, when allegations of misuse of APT's information

are removed, APT does not allege one or more unlawful, overt acts committed in furtherance of the alleged conspiracy.

In addition, all of APT's alleged damages stem from Defendants' alleged misuse of APT's information. Accordingly, APT also cannot establish damages—which is an essential element of a civil conspiracy claim—when allegations of misuse of APT's information are removed. Therefore, the court concludes that APT's civil conspiracy claim is preempted by the UUTSA.[15] *See Giles Constr.*, 2015 WL 3755863, at *6. Thus, APT's civil conspiracy claim against Stoddard, Davis, and MarketDial must be dismissed. *See* UTAH CODE § 13-24-8(1).

## V.    Count VIII (Tortious Interference with Contract Against Davis and MarketDial)

Defendants move to dismiss APT's tortious interference with contract claim against Davis and MarketDial.

### A.   *Choice of Law Analysis*

APT argues that the court should apply Virginia law to its tortious interference with contract claim. As an initial matter, APT contends that there is a conflict between Utah and Virginia law with respect to the elements of a tortious interference with contract claim. Specifically, according to APT, whereas Utah law requires the plaintiff to establish that the interference with contract occurred by "improper means," Virginia law has no such requirement unless "the interference is with a contract which is terminable at will or when the interference is merely with an expectancy (contract or business)." *See* ECF No. 274 at 13. APT asserts that those exceptions are not relevant here, *see id.* ("The agreements Davis and MarketDial tortiously interfered with are not terminable at will—i.e., they are not the kind of contingent contracts or expectancies where improper methods

---

[15] The court similarly concludes that if APT's civil conspiracy claim were analyzed under Ohio law, the OUTSA would preempt the claim. *See* OHIO REVISED CODE § 1333.67(A); *Off. Depot*, 821 F. Supp. 2d at 919.

28

Appx68

become a requisite element in Virginia."), and, therefore, the court must determine which state has the most significant relationship to the claim. APT argues that Virginia has the most significant relationship to the tortious interference claim because "the place where the injury occurred is Virginia"; "the conduct causing the injury occurred in Utah, Ohio, and Virginia"; "the domiciles and places of business of the parties are in both Virginia and Utah"; and "the relationships between the parties to the contracts subject to the tortious interference are in Virginia . . ., New York . . ., and Ohio," and "[a]ny 'relationship' between APT and Davis/MarketDial, to the extent one exists for this analysis[,] would have been in both Virginia and Utah." *Id.* at 14–15. Thus, APT concludes that the court should apply Virginia law to the tortious interference claim.

Defendants do not dispute that there is a conflict between Utah and Virginia law with respect to the essential elements of a tortious interference claim. However, Defendants contend that Utah is the state with the most significant relationship to the claim. In particular, Defendants assert that, contrary to APT's contentions, the place of the alleged injury is not exclusively Virginia but is numerous states because, "[p]er the TAC, APT operates nationally and internationally" and, therefore, the alleged economic injury would be felt in those places as well. ECF No. 282 at 13. "Thus," according to Defendants, the "place of injury" factor "'does not point to any particular state because the injury occurred in many states.'" *Id.* (quoting *Bates v. Cook, Inc.*, 615 F. Supp. 662, 677 (M.D. Fla. 1984)). Defendants further contend that, more importantly, "no aspect of MarketDial and Davis's purported misconduct occurred in Virginia." *Id.* at 14. Rather, "by APT's own allegations, MarketDial and Davis acted exclusively in Utah." *Id.* Defendants assert that because the location of the alleged misconduct is the most important factor in the choice of law analysis, Utah law should govern APT's tortious interference with contract claim. The court agrees.

As a preliminary matter, the court agrees with APT that there is a true conflict between Virginia and Utah law with respect to the elements of a tortious interference with contract claim. "In order to win a tortious interference claim under Utah law, a plaintiff must . . . prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Davidson v. Baird*, 438 P.3d 928, 945 (Utah Ct. App. 2019) (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015)). In contrast, under Virginia law, "[t]he necessary elements to establish a prima facie case [for tortious interference with contract rights] are: '(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.'" *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). Accordingly, as APT notes, Utah law requires the plaintiff to establish that the defendant interfered with the contract by improper means—such as "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]," *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 353 (Utah 2019) (citation omitted)—whereas Virginia law has no such requirement for a contract of the type at issue here. Because the outcome of APT's tortious interference claim could depend on whether Utah or Virginia law is applied, there is a true conflict between the states' laws, and the court must conduct a conflict of laws analysis. *See Johnson*, 500 F. Supp. 3d at 1279.

Applying the most significant relationship test, the court concludes that Utah is the state with the most significant relationship to APT's tortious interference claim. First, as Defendants note, although the alleged injury may have been felt most strongly in Virginia—APT's principal

place of business—because APT does business across the country, it is likely that any injury from Defendants' alleged tortious interference occurred in many states, minimizing the weight that should be placed on the "place of injury" factor in the analysis. *See Bates*, 615 F. Supp. at 677 ("Where, as here, the injury occurred in two or more states, this contact does not play as important a role."). Thus, the place of Davis's and MarketDial's alleged conduct should be "given particular weight in determining which state's law is applicable." *See id.*; *Waddoups*, 54 P.3d at 1060. As APT acknowledges, Utah is the place "from where Davis and MarketDial were interfering." ECF No. 274 at 15. Therefore, Utah has the most significant relationship to APT's tortious interference claim and the court will analyze that claim under Utah law.[16] *See Soundvision Techs.*, 929 F. Supp. 2d at 1192.

B.      *Substantive Analysis*

Defendants argue that the UUTSA preempts APT's tortious interference claim against Davis and MarketDial because "[a]bsent allegations regarding misuse of information," the claim would vanish. ECF No. 196 at 15. Specifically, Defendants contend that the tortious interference claim "alleges that Mr. Davis and MarketDial worked through Mr. Stoddard to obtain APT's confidential and trade secret information so they could misuse that information in a competing business. Upon removing allegations regarding the acquisition and misuse of APT's information, the claim falls apart." *Id.* (internal citation omitted). In particular, Defendants assert that "[w]ithout the actual disclosure or misuse of the purported trade secret and confidential information protected

---

[16] For the sake of completeness, the court further notes that, according to the TAC, Davis is domiciled in Utah, MarketDial is domiciled in both Delaware and Utah, and APT is domiciled in both Delaware and Virginia. *See* ECF No. 189 ¶¶ 13–14, 16. Moreover, there is no apparent relevant relationship between Davis and MarketDial and APT. Therefore, the other factors considered in the most significant relationship test do not weigh strongly in either Utah's or Virginia's direction.

by the confidentiality agreements raised in the TAC, there is simply no harm to APT and no claim of tortious interference." ECF No. 214 at 11.

APT responds that its tortious interference claim is not preempted "because it does not depend on or necessarily involve alleged misuse of confidential information." ECF No. 210 at 19 (citation omitted). Specifically, APT contends that the allegations contained in the TAC "are much broader than Defendants' characterization; they encompass a range of interfering conduct that diverges from the misappropriation and falls outside the scope of the UUTSA." *Id.* The court disagrees and concludes that the UUTSA preempts APT's tortious interference claim.

Similar to APT's fraud and civil conspiracy claims, APT's claim for tortious interference cannot survive without allegations regarding the misuse of its information. First, the contractual obligations with which Davis and MarketDial allegedly interfered were Stoddard's confidentiality obligations to APT. *See, e.g.*, ECF No. 189 ¶ 140 ("Despite knowing of Stoddard's confidentiality obligations, and despite Davis's own confidentiality obligations to APT, Davis, and MarketDial[,] acting through Davis, requested that Stoddard obtain APT confidential and trade secret information while Stoddard worked at McKinsey with APT and induced Stoddard to breach those confidentiality agreements, including by offering to go into business with Stoddard as a co-founder of MarketDial. Beginning as early as February 2015, with Davis's encouragement and inducement, Stoddard sent Davis the APT confidential and trade secret information he accessed."); *id.* ¶ 143 ("As a direct and proximate result of Davis's and MarketDial's knowing and improper interference convincing Stoddard to *breach his and McKinsey's confidentiality obligations to APT*, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial." (emphasis added)). Moreover, APT's alleged injuries stem entirely from the alleged misuse of its information. *See, e.g., id.* ¶ 141 ("As a direct and proximate result of Davis's

32

Appx72

and MarketDial's encouragement, inducement, and interference, Stoddard duped APT into providing Stoddard APT's confidential, trade secret information and concealed his and Davis's plans to develop, and actual development of, a competing software product through MarketDial."); *id.* ("Further, upon information and belief, Defendants have in fact used APT's trade secret and confidential information in developing the MarketDial system, to develop its business, technical and marketing strategy, and to unfairly compete with and steal clients from APT, knowing that misappropriated APT trade secret and confidential information was obtained through deceitful means. At a minimum, Defendants could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted Defendants . . . to develop a product and service that MarketDial has used to compete against APT in a manner that could not have been accomplished in the absence of Defendants' misappropriation."). Thus, when allegations of misuse of APT's information are removed, APT has failed to allege an injury caused by Davis and MarketDial's alleged tortious interference, which is an essential element of such a claim. Therefore, the court concludes that APT's tortious interference claim against Davis and MarketDial is preempted by the UUTSA, *see Giles Constr.*, 2015 WL 3755863, at *6, and must be dismissed, *see* UTAH CODE § 13-24-8(1).

## VI.     Counts I and II (Misappropriation of Trade Secrets Against Davis)

Defendants move to dismiss APT's misappropriation of trade secrets claims against Davis. According to Defendants, both count I, asserting a violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and count II, asserting a violation of the UUTSA, are barred by the applicable statutes of limitations as to Davis. Specifically, Defendants contend that both the DTSA and UUTSA are subject to three-year limitations periods and that, based on the allegations

contained in the original complaint that APT filed in this case, "APT was plainly aware (or reasonably should have been aware) of Mr. Davis'[s] alleged misappropriation by *at least* the filing of the original complaint in this matter more than three years ago." ECF No. 196 at 20. Therefore, according to Defendants, these claims against Davis are time-barred.

APT responds that its misappropriation of trade secrets claims against Davis are not precluded by the relevant statutes of limitations. Specifically, APT asserts that "for a limitations defense to ever succeed at the Rule 12(b)(6) stage of litigation, it must be readily apparent from the face of the complaint and clear from the allegations that the claims are time-barred," and "[n]othing on the face of the TAC shows that APT's misappropriation claims against Davis are time-barred." ECF No. 210 at 22. APT further asserts that "[w]hen APT brought suit, it did not have information or belief that Davis had personally engaged in conduct to obtain APT's trade secrets from Stoddard." *Id.* at 23. Rather, according to APT, it only discovered this alleged fact "after Defendants' document production" in 2021. *Id.* at 23–24. APT further contends that "the question of when APT should have discovered its claims," as well as "APT's diligence pursuing that information, are fact questions not usually appropriate for a Rule 12(b)(6) motion." *Id.* at 25. The court agrees and declines to dismiss APT's misappropriation claims against Davis.

"A statute of limitations bar is an affirmative defense, but may be resolved on a motion to dismiss if 'the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Kang Sik Park v. First Am. Title Ins. Co.*, 743 F. App'x 902, 904 (10th Cir. 2018) (unpublished) (citation omitted). In addition, the court may glean the relevant dates by "consider[ing] 'matters of which a court may take judicial notice,'" including a party's previous filings in the case. *See Wei v. Univ. of Wyo. Coll. of Health Sch. Pharm.*, 759 F. App'x 735, 740 (10th Cir. 2019) (unpublished) (quoting *Warnick v. Cooley*, 895 F.3d 746, 754 n.6 (10th Cir. 2018)).

Here, neither the TAC nor APT's original complaint "make clear that the right sued upon has been extinguished." *See Kang Sik Park*, 743 F. App'x at 904. As both parties note, both the DTSA and the UUTSA have limitations periods of three years. *See* 18 U.S.C. § 1836(d) ("A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."); UTAH CODE § 13-24-7 ("An action for misappropriation shall be brought within three years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered."). Thus, the issue is whether the allegations in the TAC or the original complaint "make clear" that APT discovered, or should have discovered, Davis's alleged misappropriation of APT's trade secrets more than three years before APT filed the misappropriation claims against Davis on July 27, 2021. *See* ECF No. 188.

As Defendants essentially concede, the TAC does not contain dates from which it can be concluded that APT discovered, or should have discovered, Davis's alleged misappropriation more than three years before July 27, 2021. Rather, Defendants primarily rely on the allegations in APT's original complaint—which was filed on June 28, 2018, *see* ECF No. 1—to argue that "APT was plainly aware (or reasonably should have been aware)" of Davis's alleged misappropriation before July 27, 2018, *see* ECF No. 196 at 20. To be sure, APT's original complaint contains allegations from which a reasonable person could infer that, at a minimum, APT should have discovered Davis's alleged misappropriation by June 28, 2018, more than three years before APT filed the misappropriation claims against Davis. *See, e.g.*, ECF No. 1 ¶ 28 ("Stoddard co-founded with Davis MarketDial, a Delaware corporation, intending to compete with APT in the predictive software business for retailers."); *id.* ¶ 32 ("Upon information and belief, Davis was a member of a BCG team that had access to APT's software."); *id.* ¶ 53 ("As co-founder and chief data scientist

of MarketDial, it is inevitable that Stoddard intentionally and/or inherently disclosed APT's confidential information and trade secrets that he obtained while at McKinsey to MarketDial, for the benefit of MarketDial and Stoddard, and to the detriment of APT."); *id.* ¶ 75 ("Upon information and belief, Stoddard solicited and collected APT's trade secret information, and used MarketDial as part of a scheme to misappropriate such trade secrets to get MarketDial up and running to develop software products to compete with APT and steal its business. . . . At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products."); *id.* ¶ 76 ("Further, on information and belief, given Stoddard's position as the Chief Data Scientist and co-founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use, or are using[,] this information to APT's detriment.").

However, at this stage, the court must view the allegations in the light most favorable to APT. *See Burnett*, 706 F.3d at 1235. Based on the allegations in APT's original complaint, a reasonable person, viewing such allegations in the light most favorable to APT, could conclude that, while Stoddard and MarketDial misappropriated APT's trade secrets, Davis did not personally engage in such misappropriation. Even though Davis was co-founder and CEO of MarketDial, a reasonable person could conclude from the original complaint that Davis was shielded from personal involvement in Stoddard and MarketDial's alleged misappropriation of APT's trade secrets. Therefore, APT's original complaint does not establish that APT discovered Davis's alleged misappropriation more than three years before it filed the TAC, and it also does not conclusively establish that APT should have discovered Davis's alleged misappropriation more

36

**Appx76**

than three years before it filed the TAC, since that is generally a question of fact for a jury to determine. *See Maughan v. SW Servicing*, 758 F.2d 1381, 1387–88 (10th Cir. 1985) ("It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."); *McKinnon v. Tambrands*, 815 F. Supp. 415, 418 (D. Utah 1993) ("The court notes at the outset the majority rule that when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."). Consequently, the court declines to dismiss APT's misappropriation of trade secrets claims against Davis on the basis that they are barred by the applicable statutes of limitations.

<h2 style="text-align:center">CONCLUSION AND ORDER</h2>

The court rules as follows:

The court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial Dismissal (ECF No. 195). The court dismisses APT's claims for breach of contract against Stoddard (count IV) and breach of contract against Davis (count V) WITH PREJUDICE. The court dismisses APT's claims for fraudulent misrepresentation and fraudulent nondisclosure against Stoddard (count VI), civil conspiracy against Stoddard, Davis, and MarketDial (count VII), and tortious interference with contract against Davis and MarketDial (count VIII) WITHOUT PREJUDICE. The court declines to dismiss APT's claims for misappropriation of trade secrets under the DTSA and UUTSA against Davis (counts I and II).

DATED March 17, 2022.

BY THE COURT

_____

Jill N. Parrish

United States District Court Judge

**Appx78**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARKETDIAL, INC., JOHN M. STODDARD, and MORGAN DAVIS, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SANCTIONS** <br><br><br> Case No. 2:19-cv-00496-JNP-CMR <br><br> District Judge Jill N. Parrish |

Before the court is a motion brought by MarketDial Inc., John M. Stoddard, and Morgan Davis (collectively "Defendants") requesting that the court sanction Plaintiff Applied Predictive Technologies Inc., ("APT") for alleged violations of Rule 3.4(f) of the Utah Rules of Professional Conduct committed by counsel for APT. ECF No. 302. The court DENIES Defendants' motion.

## BACKGROUND

Defendants John M. Stoddard and Morgan Davis were previously employed at two consulting firms that had been hired by APT. While working for these consulting firms, Mr. Stoddard and Mr. Davis had access to APT's confidential information. In 2015, Mr. Stoddard and Mr. Davis co-founded MarketDial, Inc., a predictive business analytics company that directly competes with APT. In 2018, APT initiated this lawsuit against Defendants alleging that they had misappropriated APT's trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Utah Uniform Trade Secrets Act ("UUTSA"), UTAH CODE § 13-24-1 *et seq.*, and had engaged in breach of contract, fraud, civil conspiracy, and tortious

interference with contract. ECF Nos. 1, 188. APT retained Dentons US LLP ("Dentons") as lead counsel for this case and Ray, Quinney & Nebeker P.C.as local counsel. ECF No. 302. Defendants filed a motion to dismiss, and on March 17, 2022, this Court dismissed the breach of contract, fraud, civil conspiracy, and tortious interference claims against Defendants. ECF No. 296. However, the two misappropriation of trade secrets claims remained. *Id.*

One of the key disputed elements in the misappropriation of trade secrets claim is the scope of APT's trade secrets. APT has repeatedly asserted that its prospecting process and the associated marketing materials, such as PowerPoints concerning APT's user interface and sales pitch, are confidential trade secrets. ECF Nos. 23, 102, 189. But Defendants assert that any information that APT disclosed to potential customers without requiring that the potential customers sign a Non-Disclosure Agreement (NDA) is not confidential. ECF No. 302.

To determine what APT regularly disclosed to customers in the absence of a NDA, Defendants messaged former APT salespeople via LinkedIn, an online professional networking platform. For example, Mr. Davis sent the following message to former APT employee Brian Yeh.

**Random favor?**

Hey Greg,

Hoping you can help with a super random ask. We've got a lot of mutuals in common that can vouch for me :)

I'm the CEO of MarketDial, a competitor to APT in the test and learn space. I'm trying to learn a bit more about APT's prospecting process. APT's actually suing MarketDial claiming that any viewing of their ux or sales pitch deck is trade secret theft. We've heard from others this is routinely shared without an NDA. We're candidly trying to triangulate our defense. Hoping you'll corroborate the base fact that APT regularly shares these w/o an NDA.

2

I know it's a reach but hoping you'll help a founder out here :)

Morgan

Davis LinkedIn Message Ex. A, ECF No. 334-1. At first, some of APT's former employees responded to the messages sent by the Defendants. *See* Frekko–Osborne Email Exchange Ex. 2, ECF No. 302-2 ("Hey Kelly, thanks for taking the time to talk with me yesterday! Based on our conversation, it sounds like you and the other salespeople at APT consistently pitched APT's software, including sharing presentations. . . . If I've misunderstood anything, let me know.")

On August 2, 2021, upon being alerted that Defendants were reaching out to former APT employees on LinkedIn, Jennifer Bennett, an attorney for Dentons, sent out thirteen unsolicited LinkedIn messages to former APT employees. The message stated:

> I apologize in advance for this unsolicited message in your LinkedIn account. I am an attorney for Applied Predictive Technologies in a lawsuit APT filed against MarketDial and its co-founders Morgan Davis and Johnny Stoddard alleging, among other things, they misappropriated APT's trade secrets. Unfortunately, we understand that Morgan Davis may have recently reached out to you on LinkedIn, because you are a former APT employee, seeking confidential APT information relating to APT's prospecting process. If you did not receive a message from Mr. Davis, I am sorry to have bothered you and you can ignore this message. If you did receive such a message from Mr. Davis, if you could please let me know immediately, and please let me know if you responded to Mr. Davis. We kindly ask that you do not respond to any such communications. As a reminder, APT employee's obligation to maintain the confidentiality of APT's confidential information continues after departure from APT. APT considers its prospecting process confidential.

Bennett LinkedIn Message, Aug. 2, 2021 Ex. 1, ECF No. 304-1.

On August 3, 2021, Kirk Ruthenberg, another attorney employed by Dentons, emailed Defendants' counsel and "demand[ed] that your clients immediately cease and desist from any efforts to contact APT's former or present employees . . . ." Ruthenberg Email, Aug. 3, 2021 Ex.

3

7, ECF No. 302-7. Dentons also informed Defendants' counsel that Dentons intended to represent all former APT employees who were expected to serve as witnesses in this case. *Id.* ("Additionally, it is the intention of APT to have Dentons represent any former APT employee who is or is expected to be a witness in connection with this litigation.").

On August 4, 2021, Defendants' counsel responded that APT and Dentons' behavior "raises serious concerns under Rule 3.4 of Utah's Rules of Professional Conduct." Finberg Email, Aug. 4, 2021 Ex. 8, ECF No. 302-8. On August 6, 2021, Dentons replied to Defendants' counsel and disclaimed all allegations that they had violated Rule 3.4. Ruthenberg Email, Aug. 4, 2021 Ex. 9, ECF No. 302-9 ("We categorically reject your unfounded suggestion that we are doing anything that could remotely raise concerns about Rule 3.4 of Utah's Rules of Professional Conduct."). Following the LinkedIn message sent by Dentons on August 2, 2021, none of the former APT employees responded to Defendants.

Afterwards, Defendants issued subpoenas to the former APT employees. At the time this motion was filed, Defendants had deposed five former APT employees and had scheduled six more depositions. ECF No. 336 at 6–7. Defendants asked the former APT employees about the contents of the LinkedIn messages that had been sent by Dentons on August 2, 2021 during the depositions. Charette Dep., ECF No. 304-10. Dentons advised the former APT employees to refrain from answering and assert that the contents of the LinkedIn messages were protected by the attorney-client privilege. *Id.* at 69:1–69:24. Defendants contested the assertion that the August 2, 2021, LinkedIn messages were privileged and filed a motion requesting that Dentons produce these messages. ECF No. 222. On February 3, 2022, Magistrate Judge Romero ordered APT to produce the LinkedIn messages, ECF No. 283, asserting that attorney-client privilege was inapplicable because the former employees were not clients of Dentons when the messages

4

had been sent. *Id* at 4 ("The two LinkedIn messages clearly demonstrate Frekko was not seeking advice from either Mr. Jackson or Ms. Bennett. . . . Under no set of circumstances does the law support Plaintiff's assertion that such messages are privileged.").

Defendants ask the court to sanction APT for Dentons' conduct surrounding the August 2, 2021 LinkedIn messages. Defendants first assert that by sending the unsolicited LinkedIn messages Dentons violated Rule 3.4(f) of the Utah Rules of Professional Conduct. ECF No. 302. Because of this alleged violation, Defendants request that at trial, the court provide a jury instruction that Defendants are entitled to an inference that the testimony of the former employees would have been more favorable to Defendants absent Dentons' intervention. ECF No. 304 at 9. Second, Defendants assert that Dentons, in bad faith, asserted faulty attorney-client privilege claims in order to cover up the ethical violations committed by Dentons' attorneys in sending the LinkedIn messages. ECF No. 304, at 11. Defendants ask the court to award them attorneys' fees arising from additional measures Defendants had to take to discover information that could have been more easily discovered had Dentons not sent the August 2, 2021 LinkedIn messages. *Id.*

## LEGAL STANDARD

> A lawyer shall not . . . request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of the client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

UTAH R. PROF. COND. § 3.4(f). "[T]he adversary system contemplates that the evidence in a case is to be marshalled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly

5

influencing witnesses, obstructive tactics in discovery procedure and the like." UTAH R. PROF. COND. § 3.4 cmt. 1.

## ANALYSIS

The court is persuaded that the thirteen unsolicited LinkedIn messages sent by Dentons on August 2, 2021 do not violate Rule 3.4(f). The LinkedIn messages meet the first two prongs of a 3.4(f) violation. The LinkedIn messages were sent by Jennifer Bennett, who is an attorney, and when the messages were sent, the former employees who received the messages had not retained either Dentons or Ms. Bennett as counsel. The only remaining question is whether the messages ask former APT salespeople to refrain from giving Defendants relevant information.

Defendants argue that Dentons has violated Rule 3.4(f) because the messages ask former employees to refrain from disclosing information regarding APT's prospecting process. This information is essential to defendants' defense in the misappropriation of trade secrets claim. But Dentons argues that the messages do not violate Rule 3.4(f) because the LinkedIn messages only remind former employees to refrain from violating a pre-existing duty of confidentiality. The court agrees with Dentons.

The court is persuaded that the LinkedIn messages do not request that the former APT employees refrain from sharing *any* relevant information with Defendants, but rather, asks only that the former employees refrain from sharing *confidential information* with Defendants. By way of introduction, the LinkedIn messages state that "Morgan Davis may have recently reached out to you on LinkedIn, because you are a former APT employee, seeking confidential APT information relating to APT's prospecting process. . . . We kindly ask that you do not respond to

6

any *such* communications."[1] Bennett LinkedIn Message, Aug. 2, 2021 (emphasis added). Dentons further clarifies that "APT considers its prospecting process confidential" and that "APT employee's obligation to maintain the confidentiality of APT's confidential information continues after departure from APT." *Id.* Dentons provides Ms. Bennett's contact information in case the former APT employees are unclear about what they can share with Defendants. *Id.* Simply stated, the court is convinced that Dentons did not ask former APT employees to refrain from communicating with Defendants on all relevant matters, but only regarding confidential ones.

The fact that this case involves trade secrets claims under the DTSA and UUTSA illuminates Dentons' motivations for sending the LinkedIn messages to the former employees. Under both the DTSA and UTSA, information qualifies as a trade secret only if the owner has taken reasonable efforts to keep such information secret. *See* 18 U.S.C. § 1839(3)(A); UTAH CODE § 13-24-2(4)(b). "The burden of demonstrating the existence of a trade secret is on the plaintiff, and there is no presumption in his or her favor." *Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994). "[T]rade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering . . . ." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 473 (1974).

APT claims that its prospecting process is a trade secret. If APT had decided not to act upon learning that Defendants were reaching out to former employees regarding APT's prospecting process, Defendants could later assert that APT's failure to act serves as evidence

---

[1] In their motion for sanctions, Defendants replaced the word, "such," with ellipses, thereby materially altering the meaning of the prior sentence. ECF No. 302 at 2.

that APT concedes that its prospecting process is not a trade secret. And, in fact, Defendants did make such a claim with respect to information gleaned from APT's response to this motion. Defendants assert that APT's disclosure that NDAs were required in one part of the prospecting process undercuts APT's claim that APT's prospecting process is a trade secret. Reply at 5, ECF No. 344 (refuting APT's assertion that disclosure restrictions during the prospecting process are trade secrets because "APT publicly discloses [in its opposition brief], without redaction, a former employee's testimony that APT required an NDA before performing a live demo of its software but not for certain other presentations . . . .").

Defendants assert that because they were not seeking confidential information, APT's messages were improper. Defendants provide the deposition of a former APT employee to support their claim. *See* Hsu Depo. Ex. 6 at 29:5–8, ECF No. 304-6 (affirming that Mr. Davis reminded the witness not to reveal APT's confidential information during their conversation). Defendants also argue that Dentons could have requested an injunction pursuant to 18 U.S.C. § 1836(b)(3)(A) if Dentons was concerned about Defendants misappropriating trade secrets through the discovery process. But the question here is not whether Defendants were conducting improper discovery, but whether the messages Dentons sent to the former APT employees violated Rule 3.4(f). Even if Defendants did not request confidential information, an unintentional disclosure by a former APT employee could compromise the alleged trade secret. Accordingly, the relevant inquiry is whether 3.4(f) prohibits attorneys from warning non-clients against violating preexisting duties of confidentiality.

The court is not persuaded that Rule 3.4(f) prohibits an attorney from reminding non-clients that they owe a legal duty to the attorney's current client. Defendants cite *Harlan v. Lewis*, 982 F.2d 1255 (8th Cir. 1993), *Synergetics, Inc. v. Hurst*, No. 4:04CV318CDP, 2007 WL

8

2422871 (E.D. Mo. Aug. 21, 2007), *Massachusetts Inst. of Tech. v. Imclone Sys., Inc.*, 490 F. Supp. 2d 119 (D. Mass. 2007), and *Harris v. SCA Rest. Corp.*, No. 09-CV-2212 JFB ETB, 2014 WL 996249 (E.D.N.Y. Mar. 14, 2014), for the proposition that courts may sanction counsel for Rule 3.4(f) violations. However, the facts here materially differ from those in the cited cases. In *Harlan*, defense counsel convinced the plaintiff's treating physicians to refrain from cooperating with opposing counsel and from providing expert testimony. *Harlan*, at 1259. In *Synergetics*, counsel conditioned a settlement agreement on the witness not testifying at trial. *Synergetics*, at *9. Counsel in *Imclone* had "for all intents and purposes demand[ed] that [the witness's employer] rein [the witness] in." *Imclone*, at 126. In *Harris*, the defendant threatened to fire the witnesses if they testified at trial. *Harris* at *4. In short, these cases can be distinguished because the counsel in these cases engaged in clear violations of Rule 3.4(f).

The purpose of Rule 3.4(f) is to maintain "[f]air competition" and protect against counsel "improperly influencing witnesses." UTAH R. PROF. COND. § 3.4 cmt. 1. The court balances the Defendants' rights to informally gather relevant information from witnesses ex-parte against APT's right to protect information it claims is confidential. Because "the nondisclosure obligation would exist even in the absence of the lawyer's request, [] it would serve no purpose to read the rule to prevent a lawyer from taking steps to ensure compliance." Jon Bauer, *Buying Witness Silence: Evidence-Suppressing Settlements and Lawyers' Ethics*, 87 OR. L. REV. 481, 560 (2008); *see* ALA. R. PROF. COND. 3.4(d)(2) (providing, under a similar conduct rule, that an attorney may request a non-client refrain from giving relevant information when "[t]he person may be required by law to refrain from disclosing the information . . . ."). However, "[s]eeking to block the disclosure of information about wrongful conduct that is relevant to the claims of other

litigants . . . under the guise of trade secret protection, would violate Rule 3.4(f)." Bauer, *supra*, at 561.

It can hardly be the case that reminding witnesses of a pre-existing legal duty rises to the level warranting sanctions. The messages are not "inappropriately heavy-handed," and do not, as Defendants suggest, "go[] so far as to insinuate that the witnesses may end up being sued if they responded to Defendants' inquiries." Reply at 8, ECF No. 344. Furthermore, Defendants had the opportunity to depose the former employees. Defendants have already deposed five former APT employees and have scheduled six more depositions. In *Harlan*, *Imclone*, *Synergetics*, and *Harris*, counsel either dissuaded or fully prevented the witnesses from testifying at trial, in effect denying opposing counsel the ability to use relevant information that the witnesses may have been able to provide. Here, the primary injury resulting from Dentons' actions is that Defendants are forced to issue subpoenas to the former employees. In short, the court concludes that the messages sent by Dentons do not rise to the level of a 3.4(f) violation.

Defendants assert that Dentons' claim that the LinkedIn messages were cabined to protecting APT's confidential information is largely pretextual. The court is aware that former APT employees are unlikely to have carefully parsed the language of the message. Thus, receiving Ms. Bennett's LinkedIn message would have had the practical effect of preventing the former employees from further communicating with Defendants. However, the court is unaware of, and Defendants fail to cite, relevant law supporting the proposition that attorneys should be sanctioned under Rule 3.4(f) when their communications have the practical effect of deterring communications, but the actual communication does not unambiguously deter the non-client from communicating.

In balancing Defendants' right to informally contact witnesses against APT's right to protect its confidential information, the court finds Dentons' baseless allegations of attorney-client privilege informative as to Dentons' motivations for sending the messages. After Dentons had sent the messages, it sought to represent all former APT employees who Defendants intended to subpoena. During the depositions, Dentons advised former APT employees to refuse to testify regarding the contents of the LinkedIn messages and assert that the communications were protected by attorney-client privilege. *See* Charette Dep. at 69:1–69:24. However, at the time the messages were sent, none of the former APT salespeople had retained Dentons as counsel. "Under no set of circumstances does the law support Plaintiff's assertion that such messages are privileged." ECF No. 283 at 4. Had APT messaged its former employees in place of Dentons, there would have been no concern with a 3.4(f) violation and Dentons also would not have been able to assert its unsuccessful claim of attorney-client privilege. But the court's rejection of the privilege claim does not render sanctions appropriate.

Even if the court were to conclude that Dentons had violated Rule 3.4(f), the sanctions proposed by Defendants are unwarranted. Defendants ask the court to (1) give a jury instruction that Defendants are entitled to an adverse inference concerning the testimony of the former APT employees and (2) award Defendants fees and costs related to uncovering the alleged Rule 3.4 violation.

Defendants assert that the adverse jury instruction is an appropriate remedy because, absent Dentons' intervention, former APT employees may have provided testimony more favorable to Defendants. The court disagrees. While it is possible that the LinkedIn messages sent by Dentons made the former APT employees less willing to communicate ex parte with Defendants, Defendants nevertheless were able to depose the witnesses and obtain their sworn

11

testimony. Under these circumstances, it would be unwarranted for the court to instruct the jury to make an inference that is contrary to the testimony given by witnesses under oath with counsel for both parties present. Moreover, even in the absence of Dentons' message, former APT employees were not obligated to, and may have chosen not to, respond to Defendants' requests.

Defendants maintain that they were motivated to request an adverse inference instruction as a sanction because some of the initial ex-parte statements that the former APT employees had provided were more favorable to Defendants than their subsequent deposition testimony. ECF No. 304 at 10. But Defendants could have asked the former employees about any such inconsistencies in their statements during their depositions and they failed to do so. Defendants also retain the ability to impeach the witnesses at trial with their alleged inconsistent statements. The case law that Defendants cite relating to adverse inference sanctions applies to situations where witnesses are not available. The court is unaware of any authority supporting the idea that counsel's violation of 3.4(f) justifies an adverse inference jury instruction when the opposing party may, and already has, deposed the witness. Defendants cite *Imclone* for the proposition that the court may order an adverse inference instruction. Notwithstanding the fact that counsel in *Imclone* engaged in more violations of Rule 3.4(f) not present here, the court in *Imclone* did not grant an adverse inference instruction. Rather, the court "permitted [MIT] to offer evidence of the improper conduct of ImClone's attorneys to lay a foundation for an instruction permitting the jury to draw an inference that ImClone believed that [the absent witness's testimony would have] supported MIT's claims in the litigation." *Imclone*, 490 F. Supp. 2d at 127.

In summary, the court concludes that even if the message sent by Dentons violated Rule 3.4(f), an adverse inference instruction is unwarranted. It therefore denies Defendants' request.

The court is also not persuaded to award costs and fees to Defendants. Defendants argue that Dentons' behavior caused Defendants to "engage in protracted correspondence with APT's counsel" and file several motions regarding APT's allegations of attorney-client privilege. ECF No. 304 at 11. District courts have the inherent power to "levy sanctions in response to abusive litigation practices." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980). This power includes assessing attorney's fees "against counsel who willfully abuse judicial processes." *Id.* at 766. However, "attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Id.* at 767; *see Harris* at *1 (awarding attorney's fees because "the Court finds that the defendants' retaliatory discrimination against trial witnesses constituted bad faith conduct in this litigation . . . .").

Magistrate Judge Romero held that "[u]nder no set of circumstances does the law support Plaintiff's assertion" that the LinkedIn messages sent to APT's former employees were covered by attorney-client privilege. ECF No. 283 at 4. While the court notes Dentons' gamesmanship on the privilege issue, it does not justify an award of attorneys' fees to Defendants with respect to this unsuccessful motion for sanctions. Although Defendants assert that attorney's fees are appropriate because Dentons' messages caused Defendants to incur extra costs in issuing subpoenas and taking formal depositions, these are routine efforts in which counsel engages as part of the discovery process. In short, the court concludes that an award of attorneys' fees and costs is inappropriate.

## CONCLUSION & ORDER

The court concludes that Dentons did not violate Rule 3.4(f) of the Utah Rules of Professional Conduct and DENIES the motion for sanctions. ECF No. 302.

DATED February 7, 2023.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

**Appx92**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  24-1751

**Short Case Caption:**  Applied Predictive v. Marketdial, Inc., et al.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,958  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/04/2024

Signature:  /s/ David B. Goroff

Name:  /s/ David B. Goroff